# WILLIAMS v. TAYLOR, WARDEN

No. 98–8384.   Argued October 4, 1999—Decided April 18, 2000

364

STEVENS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined, and an opinion with respect to Parts II and V, in which SOUTER, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., delivered the opinion of the Court with respect to Part II (except as to the footnote), in which REHNQUIST, C. J., and KENNEDY and THOMAS, JJ., joined, and in which SCALIA, J., joined, except as to the footnote, and an opinion concurring in part and

concurring in the judgment, in which KENNEDY, J., joined, *post*, p. 399. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which SCALIA and THOMAS, JJ., joined, *post*, p. 416.

*John J. Gibbons* argued the cause for petitioner. With him on the briefs were *Brian A. Powers*, by appointment of the Court, 526 U. S. 1110, and *Ellen O. Boardman*.

*Robert Q. Harris*, Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief was *Mark L. Earley*, Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Bar Association by *Philip S. Anderson, Abe Krash, Kathleen A. Behan*, and *John A. Freedman;* for the American Civil Liberties Union by *Larry W. Yackle* and *Steven R. Shapiro;* for the National Association of Criminal Defense Lawyers by *John D. Cline* and *Lisa B. Kemler;* for the Virginia College of Criminal Defense Attorneys et al. by *Gerald T. Zerkin;* for Professors Lance G. Banning et al. by *Barry Levenstam* and *Jeffrey T. Shaw;* and for Marvin E. Frankel et al. by *Abner J. Mikva*.

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer*, Attorney General of California, *David Druliner*, Chief Assistant Attorney General, *Dane R. Gillette*, Senior Assistant Attorney General, and *Donald E. De Nicola* and *Ward A. Campbell*, Deputy Attorneys General, joined by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *John M. Bailey* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Carla Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Thomas F. Reilly* of Massachusetts, *Michael C. Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *John J. Farmer, Jr.*, of New Jersey, *Patricia A. Madrid* of New Mexico, *Michael E. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Jan Graham* of Utah, *Christine O. Gregoire* of Washington, and *Darrell McGraw, Jr.*, of West Virginia; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger*.

JUSTICE STEVENS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, and an opinion with respect to Parts II and V.*

The questions presented are whether Terry Williams' constitutional right to the effective assistance of counsel as defined in *Strickland* v. *Washington,* 466 U. S. 668 (1984), was violated, and whether the judgment of the Virginia Supreme Court refusing to set aside his death sentence "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. III). We answer both questions affirmatively.

## I

On November 3, 1985, Harris Stone was found dead in his residence on Henry Street in Danville, Virginia. Finding no indication of a struggle, local officials determined that the cause of death was blood alcohol poisoning, and the case was considered closed. Six months after Stone's death, Terry Williams, who was then incarcerated in the "I" unit of the city jail for an unrelated offense, wrote a letter to the police stating that he had killed "'that man down on Henry Street'" and also stating that he "'did it'" to that "'lady down on West Green Street'" and was "'very sorry.'" The letter was unsigned, but it closed with a reference to "I cell." App. 41. The police readily identified Williams as its author, and, on April 25, 1986, they obtained several statements from him. In one Williams admitted that, after Stone refused to lend him "'a couple of dollars,'" he had killed Stone with a

---

*JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join this opinion in its entirety. JUSTICE O'CONNOR and JUSTICE KENNEDY join Parts I, III, and IV of this opinion.

mattock and taken the money from his wallet.[1]  *Id.*, at 4. In September 1986, Williams was convicted of robbery and capital murder.

At Williams' sentencing hearing, the prosecution proved that Williams had been convicted of armed robbery in 1976 and burglary and grand larceny in 1982. The prosecution also introduced the written confessions that Williams had made in April. The prosecution described two auto thefts and two separate violent assaults on elderly victims perpetrated after the Stone murder. On December 4, 1985, Williams had started a fire outside one victim's residence before attacking and robbing him. On March 5, 1986, Williams had brutally assaulted an elderly woman on West Green Street— an incident he had mentioned in his letter to the police. That confession was particularly damaging because other evidence established that the woman was in a "vegetative state" and not expected to recover. *Id.*, at 60. Williams had also been convicted of arson for setting a fire in the jail while awaiting trial in this case. Two expert witnesses employed by the State testified that there was a "high probabil-

---

[1] "'I had gone to Dee Dee Stone's house on Henry Street, Dee Dee's father was there. No one else was there except him. He had been drinking a lot. He was on the bed. He asked me if I wanted a drink. I told him, 'No.' I asked him if I could borrow a couple of dollars and he told me, 'No.' We started arguing and things started going around in my head. I just wanted to get back at him. I don't know what. He just laid back like he had passed out. He was laying there talking and moaning to himself. I went into the kitchen. I saw the butcher knife. I didn't want to use it. I was looking for something to use. I went into the bathroom and I saw the mattock. I picked up the mattock and I came back into the room where he was at. He was laying on the bed. He was laying on his back. I took the mattock and I hit him on the chest with it. He raised up and was gasping for his breath. He fell over to his side and I hit him in the back with the mattock. He fell back on the bed. I went and put the mattock back in the bathroom. I came back into the room. I took his wallet from his pocket. He had three dollars in it. I got the three dollars from it. I left him there. He was still grasping for breath.'" App. 4–5.

ity" that Williams would pose a serious continuing threat to society. *Id.*, at 89.

The evidence offered by Williams' trial counsel at the sentencing hearing consisted of the testimony of Williams' mother, two neighbors, and a taped excerpt from a statement by a psychiatrist. One of the neighbors had not been previously interviewed by defense counsel, but was noticed by counsel in the audience during the proceedings and asked to testify on the spot. The three witnesses briefly described Williams as a "nice boy" and not a violent person. *Id.*, at 124. The recorded psychiatrist's testimony did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone.

In his cross-examination of the prosecution witnesses, Williams' counsel repeatedly emphasized the fact that Williams had initiated the contact with the police that enabled them to solve the murder and to identify him as the perpetrator of the recent assaults, as well as the car thefts. In closing argument, Williams' counsel characterized Williams' confessional statements as "dumb," but asked the jury to give weight to the fact that he had "turned himself in, not on one crime but on four . . . that the [police otherwise] would not have solved." *Id.*, at 140. The weight of defense counsel's closing, however, was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life.[2]

---

[2] In defense counsel's words: "I will admit too that it is very difficult to ask you to show mercy to a man who maybe has not shown much mercy himself. I doubt very seriously that he thought much about mercy when he was in Mr. Stone's bedroom that night with him. I doubt very seriously that he had mercy very highly on his mind when he was walking along West Green and the incident with Alberta Stroud. I doubt very seriously that he had mercy on his mind when he took two cars that didn't belong to him. Admittedly it is very difficult to get us and ask that you give this man mercy when he has shown so little of it himself. But I would ask that you would." *Id.*, at 132–133.

The jury found a probability of future dangerousness and unanimously fixed Williams' punishment at death. The trial judge concluded that such punishment was "proper" and "just" and imposed the death sentence. *Id.*, at 154. The Virginia Supreme Court affirmed the conviction and sentence. *Williams* v. *Commonwealth*, 234 Va. 168, 360 S. E. 2d 361 (1987), cert. denied, *Williams* v. *Virginia*, 484 U. S. 1020 (1988). It rejected Williams' argument that when the trial judge imposed sentence, he failed to give mitigating weight to the fact that Williams had turned himself in. 234 Va., at 181–182, 360 S. E. 2d, at 369–370.

*State Habeas Corpus Proceedings*

In 1988 Williams filed for state collateral relief in the Danville Circuit Court. The petition was subsequently amended, and the Circuit Court (the same judge who had presided over Williams' trial and sentencing) held an evidentiary hearing on Williams' claim that trial counsel had been ineffective.[3] Based on the evidence adduced after two days of hearings, Judge Ingram found that Williams' conviction was valid, but that his trial attorneys had been ineffective during sentencing. Among the evidence reviewed that had not been presented at trial were documents prepared in connection with Williams' commitment when he was 11 years old that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was "borderline mentally retarded," had suffered repeated head injuries, and might have mental impairments organic in origin. App. 528–529, 595. The habeas hearing also revealed

---

[3] While Williams' petition was pending before the Circuit Court, Virginia amended its state habeas statute to vest in the State Supreme Court exclusive jurisdiction to award writs of habeas corpus in capital cases. Va. Code Ann. §8.01–654(C)(1) (Supp. 1999). Shortly after the Circuit Court held its evidentiary hearing, the Supreme Court assumed jurisdiction over Williams' petition and instructed the Circuit Court to issue findings of fact and legal recommendation regarding Williams' ineffective-assistance claims.

that the same experts who had testified on the State's behalf at trial believed that Williams, if kept in a "structured environment," would not pose a future danger to society. *Id.,* at 313–314.

Counsel's failure to discover and present this and other significant mitigating evidence was "below the range expected of reasonable, professional competent assistance of counsel." *Id.,* at 424. Counsel's performance thus "did not measure up to the standard required under the holding of *Strickland v. Washington,* 466 U. S. 668 (1984), and [if it had,] there is a reasonable probability that the result of the sentencing phase would have been different." *Id.,* at 429. Judge Ingram therefore recommended that Williams be granted a rehearing on the sentencing phase of his trial.

The Virginia Supreme Court did not accept that recommendation. *Williams v. Warden,* 254 Va. 16, 487 S. E. 2d 194 (1997). Although it assumed, without deciding, that trial counsel had been ineffective, *id.,* at 23–26, 487 S. E. 2d, at 198, 200, it disagreed with the trial judge's conclusion that Williams had suffered sufficient prejudice to warrant relief. Treating the prejudice inquiry as a mixed question of law and fact, the Virginia Supreme Court accepted the factual determination that available evidence in mitigation had not been presented at the trial, but held that the trial judge had misapplied the law in two respects. First, relying on our decision in *Lockhart v. Fretwell,* 506 U. S. 364 (1993), the court held that it was wrong for the trial judge to rely " 'on mere outcome determination' " when assessing prejudice, 254 Va., at 23, 487 S. E. 2d, at 198 (quoting *Lockhart,* 506 U. S., at 369). Second, it construed the trial judge's opinion as having "adopted a *per se* approach" that would establish prejudice whenever any mitigating evidence was omitted. 254 Va., at 26, 487 S. E. 2d, at 200.

The court then reviewed the prosecution evidence supporting the "future dangerousness" aggravating circumstance, reciting Williams' criminal history, including the sev-

eral most recent offenses to which he had confessed. In comparison, it found that the excluded mitigating evidence— which it characterized as merely indicating "that numerous people, mostly relatives, thought that defendant was nonviolent and could cope very well in a structured environment," *ibid.*—"barely would have altered the profile of this defendant that was presented to the jury," *ibid.* On this basis, the court concluded that there was no reasonable possibility that the omitted evidence would have affected the jury's sentencing recommendation, and that Williams had failed to demonstrate that his sentencing proceeding was fundamentally unfair.

### *Federal Habeas Corpus Proceedings*

Having exhausted his state remedies, Williams sought a federal writ of habeas corpus pursuant to 28 U. S. C. § 2254 (1994 ed. and Supp. III). After reviewing the state habeas hearing transcript and the state courts' findings of fact and conclusions of law, the federal trial judge agreed with the Virginia trial judge: The death sentence was constitutionally infirm.

After noting that the Virginia Supreme Court had not addressed the question whether trial counsel's performance at the sentencing hearing fell below the range of competence demanded of lawyers in criminal cases, the judge began by addressing that issue in detail. He identified five categories of mitigating evidence that counsel had failed to introduce,[4]

---

[4] "(i) Counsel did not introduce evidence of the Petitioner's background. . . . (ii) Counsel did not introduce evidence that Petitioner was abused by his father. (iii) Counsel did not introduce testimony from correctional officers who were willing to testify that defendant would not pose a danger while incarcerated. Nor did counsel offer prison commendations awarded to Williams for his help in breaking up a prison drug ring and for returning a guard's missing wallet. (iv) Several character witnesses were not called to testify. . . . [T]he testimony of Elliott, a respected CPA in the community, could have been quite important to the jury . . . . (v) Finally, counsel did not introduce evidence that Petitioner

and he rejected the argument that counsel's failure to conduct an adequate investigation had been a strategic decision to rely almost entirely on the fact that Williams had voluntarily confessed.

According to Williams' trial counsel's testimony before the state habeas court, counsel did not fail to seek Williams' juvenile and social services records because he thought they would be counterproductive, but because counsel erroneously believed that "'state law didn't permit it.'" App. 470. Counsel also acknowledged in the course of the hearings that information about Williams' childhood would have been important in mitigation. And counsel's failure to contact a potentially persuasive character witness was likewise not a conscious strategic choice, but simply a failure to return that witness' phone call offering his service. *Id.*, at 470–471. Finally, even if counsel neglected to conduct such an investigation at the time as part of a tactical decision, the District Judge found, tactics as a matter of reasonable performance could not justify the omissions.

Turning to the prejudice issue, the judge determined that there was "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Strickland*, 466 U. S. at 694." *Id.*, at 473. He found that the Virginia Supreme Court had erroneously assumed that *Lockhart* had modified the *Strickland* standard for determining prejudice, and that it had made an important error of fact in discussing its finding of no prejudice.[5] Having introduced his analysis of Williams' claim

---

was borderline mentally retarded, though he was found competent to stand trial." App. 465–469.

[5] "Specifically, the Virginia Supreme Court found no prejudice, reasoning: 'The mitigation evidence that the prisoner says, in retrospect, his trial counsel should have discovered and offered barely would have altered the profile of this defendant that was presented to the jury. At most, this evidence would have shown that numerous people, mostly relatives, thought that defendant was nonviolent and could cope very well in a structured environment.' *Williams*, 487 S. E. 2d at 200. The Virginia Su-

with the standard of review applicable on habeas appeals provided by 28 U. S. C. § 2254(d) (1994 ed., Supp. III), the judge concluded that those errors established that the Virginia Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" within the meaning of § 2254(d)(1).

The Federal Court of Appeals reversed. 163 F. 3d 860 (CA4 1998). It construed § 2254(d)(1) as prohibiting the grant of habeas corpus relief unless the state court " 'decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable.' " *Id.*, at 865 (quoting *Green* v. *French*, 143 F. 3d 865, 870 (CA4 1998)). Applying that standard, it could not say that the Virginia Supreme Court's decision on the prejudice issue was an unreasonable application of the tests developed in either *Strickland* or *Lockhart*.[6] It explained that the evidence that Williams presented a future danger to society was "simply overwhelming," 163 F. 3d, at 868, it endorsed the Virginia Supreme Court's interpretation of *Lockhart*, 163 F. 3d, at 869, and it characterized the state court's understanding of the facts in this case as "reasonable," *id.*, at 870.

We granted certiorari, 526 U. S. 1050 (1999), and now reverse.

## II

In 1867, Congress enacted a statute providing that federal courts "shall have power to grant writs of habeas corpus in

---

preme Court ignored or overlooked the evidence of Williams' difficult childhood and abuse and his limited mental capacity. It is also unreasonable to characterize the additional evidence as coming from 'mostly relatives.' As stated, *supra*, Bruce Elliott, a respected professional in the community, and several correctional officers offered to testify on Williams behalf." *Id.*, at 476.

[6] Like the Virginia Supreme Court, the Court of Appeals assumed, without deciding, that the performance of trial counsel fell below an objective standard of reasonableness. 163 F. 3d, at 867.

all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States . . . ." Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385. Over the years, the federal habeas corpus statute has been repeatedly amended, but the scope of that jurisdictional grant remains the same.[7] It is, of course, well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas. See, e. g., Stone v. Powell, 428 U. S. 465 (1976); Brecht v. Abrahamson, 507 U. S. 619 (1993). On the other hand, errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ. See, e. g., Teague v. Lane, 489 U. S. 288, 311–314 (1989) (quoting Mackey v. United States, 401 U. S. 667, 692–694 (1971) (Harlan, J., concurring in judgments in part and dissenting in part), and quoting Rose v. Lundy, 455 U. S. 509, 544 (1982) (STEVENS, J., dissenting)). The deprivation of the right to the effective assistance of counsel recognized in Strickland is such an error. Strickland, 466 U. S., at 686, 697–698.

The warden here contends that federal habeas corpus relief is prohibited by the amendment to 28 U. S. C. § 2254 (1994 ed., Supp. III), enacted as a part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The relevant portion of that amendment provides:

---

[7] By Act of Congress: "(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. . . . (c) The writ of habeas corpus shall not extend to a prisoner unless— . . . (3) He is in custody in violation of the Constitution or laws or treaties of the United States . . . ." 28 U. S. C. § 2241(c)(3). In parallel, § 2254(a) provides: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

"(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ."

In this case, the Court of Appeals applied the construction of the amendment that it had adopted in its earlier opinion in *Green* v. *French,* 143 F. 3d 865 (CA4 1998). It read the amendment as prohibiting federal courts from issuing the writ unless:

"(a) the state court decision is in 'square conflict' with Supreme Court precedent that is controlling as to law and fact or (b) if no such controlling decision exists, 'the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant [S]upreme [C]ourt precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts,'" 163 F. 3d, at 865 (quoting *Green,* 143 F. 3d, at 870).

Accordingly, it held that a federal court may issue habeas relief only if "'the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable,'" 163 F. 3d, at 865.[8]

---

[8] The warden's view is narrower. He argues that 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. III) establishes a new general rule that prohibits federal courts from granting habeas corpus relief on the basis of any claim that a state court has adjudicated on the merits, and that § 2254(d)(1) merely identifies two narrow exceptions to the general rule—when a state court has issued a decision "contrary to" or an "unreasonable application of"

We are convinced that that interpretation of the amendment is incorrect. It would impose a test for determining when a legal rule is clearly established that simply cannot be squared with the real practice of decisional law.[9] It would apply a standard for determining the "reasonableness" of state-court decisions that is not contained in the statute itself, and that Congress surely did not intend. And it would wrongly require the federal courts, including this Court, to defer to state judges' interpretations of federal law.

As the Fourth Circuit would have it, a state-court judgment is "unreasonable" in the face of federal law only if all reasonable jurists would agree that the state court was unreasonable. Thus, in this case, for example, even if the Virginia Supreme Court misread our opinion in *Lockhart*, we could not grant relief unless we believed that none of the judges who agreed with the state court's interpretation of that case was a "reasonable jurist." But the statute says

clearly established federal law. Brief for Respondent 14–15. The first, "contrary to" exception, in his view, applies only to "starkly unreasonable" errors of law. The first category thus imposes "a standard of review far more limited than 'de novo,' 'independent' or 'plenary' review." *Id.*, at 24. The state-court judgment must thus be so far afield "as to make the 'unlawfulness' of the state court decision 'apparent.'" *Id.*, at 25. The second exception likewise replaces the "de novo" standard of reviewing mixed questions of law and fact with the standard of "objective reasonableness" as formulated by the Court of Appeals. *Id.*, at 30–31.

[9] Although we explain our understanding of "clearly established law," *infra*, at 379–384, we note that the Fourth Circuit's construction of the amendment's inquiry in this respect is especially problematic. It separates cases into those for which a "controlling decision" exists and those for which no such decision exists. The former category includes very few cases, since a rule is "controlling" only if it matches the case before the court both "as to law and fact," and most cases are factually distinguishable in some respect. A literal application of the Fourth Circuit test would yield a particularly perverse outcome in cases involving the *Strickland* rule for establishing ineffective assistance of counsel, since that case, which established the "controlling" rule of law on the issue, contained facts insufficient to show ineffectiveness.

nothing about "reasonable judges," presumably because all, or virtually all, such judges occasionally commit error; they make decisions that in retrospect may be characterized as "unreasonable." Indeed, it is most unlikely that Congress would deliberately impose such a requirement of unanimity on federal judges. As Congress is acutely aware, reasonable lawyers and lawgivers regularly disagree with one another. Congress surely did not intend that the views of one such judge who might think that relief is not warranted in a particular case should always have greater weight than the contrary, considered judgment of several other reasonable judges.

The inquiry mandated by the amendment relates to the way in which a federal habeas court exercises its duty to decide constitutional questions; the amendment does not alter the underlying grant of jurisdiction in §2254(a), see n. 7, *supra*.[10] When federal judges exercise their federal-question jurisdiction under the "judicial Power" of Article III of the Constitution, it is "emphatically the province and duty" of those judges to "say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). At the core of this

---

[10] Indeed, Congress roundly rejected an amendment to the bill eventually adopted that directly invoked the text of the jurisdictional grant, 28 U. S. C. §2254(a) (providing that the federal courts "*shall entertain* an application for a writ of habeas corpus" (emphasis added)). The amendment read: "Notwithstanding any other provision of law, an application for a writ of habeas corpus in behalf of a person in custody pursuant to a judgment or order of a State court *shall not be entertained* by a court of the United States unless the remedies in the courts of the State are inadequate or ineffective to test the legality of the person's detention." 141 Cong. Rec. 14991 (1995) (amendment of Sen. Kyl) (emphasis added). In speaking against the Kyl amendment, Senator Specter (a key proponent of the eventual habeas reform) explained that when "dealing with the question of jurisdiction of the Federal courts to entertain questions on Federal issues, on constitutional issues, I believe it is necessary that the Federal courts retain that jurisdiction as a constitutional matter." *Id.*, at 15050.

power is the federal courts' independent responsibility—independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States—to interpret federal law. A construction of AEDPA that would require the federal courts to cede this authority to the courts of the States would be inconsistent with the practice that federal judges have traditionally followed in discharging their duties under Article III of the Constitution. If Congress had intended to require such an important change in the exercise of our jurisdiction, we believe it would have spoken with much greater clarity than is found in the text of AEDPA.

This basic premise informs our interpretation of both parts of § 2254(d)(1): first, the requirement that the determinations of state courts be tested only against "clearly established Federal law, as determined by the Supreme Court of the United States," and second, the prohibition on the issuance of the writ unless the state court's decision is "contrary to, or involved an unreasonable application of," that clearly established law. We address each part in turn.

*The "clearly established law" requirement*

In *Teague* v. *Lane,* 489 U. S. 288 (1989), we held that the petitioner was not entitled to federal habeas relief because he was relying on a rule of federal law that had not been announced until after his state conviction became final. The antiretroactivity rule recognized in *Teague,* which prohibits reliance on "new rules," is the functional equivalent of a statutory provision commanding exclusive reliance on "clearly established law." Because there is no reason to believe that Congress intended to require federal courts to ask both whether a rule sought on habeas is "new" under *Teague*—which remains the law—and also whether it is "clearly established" under AEDPA, it seems safe to assume that Congress

had congruent concepts in mind.[11]   It is perfectly clear that
AEDPA codifies *Teague* to the extent that *Teague* requires
federal habeas courts to deny relief that is contingent upon
a rule of law not clearly established at the time the state
conviction became final.[12]

*Teague*'s core principles are therefore relevant to our con-
struction of this requirement.   Justice Harlan recognized

_____

[11] It is not unusual for Congress to codify earlier precedent in the habeas
context.   Thus, for example, the exhaustion rule applied in *Ex parte
Hawk*, 321 U. S. 114 (1944) *(per curiam)*, and the abuse of the writ doc-
trine applied in *Sanders* v. *United States*, 373 U. S. 1 (1963), were later
codified.   See 28 U. S. C. § 2254(b) (1994 ed., Supp. III) (exhaustion re-
quirement); 28 U. S. C. § 2254, Rule 9(b), Rules Governing § 2254 Cases in
the United States District Courts.   A previous version of § 2254, as we
stated in *Miller* v. *Fenton*, 474 U. S. 104, 111 (1985), "was an almost verba-
tim codification of the standards delineated in *Townsend* v. *Sain*, 372 U. S.
293 (1963), for determining when a district court must hold an evidentiary
hearing before acting on a habeas petition."

[12] We are not persuaded by the argument that because Congress used
the words "clearly established law" and not "new rule," it meant in this
section to codify an aspect of the doctrine of executive qualified immunity
rather than *Teague*'s antiretroactivity bar.   Brief for Respondent 28–29,
n. 19.   The warden refers us specifically to § 2244(b)(2)(A) and 28 U. S. C.
§ 2254(e)(2) (1994 ed., Supp. III), in which the statute does in so many
words employ the "new rule" language familiar to *Teague* and its progeny.
Congress thus knew precisely the words to use if it had wished to codify
*Teague per se*.   That it did not use those words in § 2254(d) is evidence,
the argument goes, that it had something else in mind entirely in amend-
ing that section.   We think, quite the contrary, that the verbatim adoption
of the *Teague* language in these other sections bolsters our impression that
Congress had *Teague*—and not any unrelated area of our jurisprudence—
specifically in mind in amending the habeas statute.   These provisions,
seen together, make it impossible to conclude that Congress was not fully
aware of, and interested in codifying into law, that aspect of this Court's
habeas doctrine.   We will not assume that in a single subsection of an
amendment entirely devoted to the law of habeas corpus, Congress made
the anomalous choice of reaching into the doctrinally distinct law of quali-
fied immunity for a single phrase that just so happens to be the conceptual
twin of a dominant principle in habeas law of which Congress was fully
aware.

the "inevitable difficulties" that come with "attempting 'to determine whether a particular decision has really announced a "new" rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law.'" *Mackey*, 401 U. S., at 695 (quoting *Desist* v. *United States*, 394 U. S. 244, 263 (1969)). But *Teague* established some guidance for making this determination, explaining that a federal habeas court operates within the bounds of comity and finality if it applies a rule "dictated by precedent existing at the time the defendant's conviction became final." 489 U. S., at 301 (emphasis deleted). A rule that "breaks new ground or imposes a new obligation on the States or the Federal Government," *ibid.*, falls outside this universe of federal law.

To this, AEDPA has added, immediately following the "clearly established law" requirement, a clause limiting the area of relevant law to that "determined by the Supreme Court of the United States." 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. III). If this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar. In this respect, we agree with the Seventh Circuit that this clause "extends the principle of *Teague* by limiting the source of doctrine on which a federal court may rely in addressing the application for a writ." *Lindh* v. *Murphy*, 96 F. 3d 856, 869 (1996). As that court explained:

> "This is a retrenchment from former practice, which allowed the United States courts of appeals to rely on their own jurisprudence in addition to that of the Supreme Court. The novelty in this portion of § 2254(d)(1) is not the 'contrary to' part but the reference to 'Federal law, as *determined by the Supreme Court of the United States*' (emphasis added). This extends the principle of *Teague* [v. *Lane*, 489 U. S. 288 (1989),] by limiting the

> source of doctrine on which a federal court may rely in addressing the application for a writ. It does not, however, purport to limit the federal courts' independent interpretive authority with respect to federal questions." *Ibid.*

A rule that fails to satisfy the foregoing criteria is barred by *Teague* from application on collateral review, and, similarly, is not available as a basis for relief in a habeas case to which AEDPA applies.

In the context of this case, we also note that, as our precedent interpreting *Teague* has demonstrated, rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule. As JUSTICE KENNEDY has explained:

> "If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule. . . . Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Wright* v. *West,* 505 U. S. 277, 308–309 (1992) (opinion concurring in judgment).

Moreover, the determination whether or not a rule is clearly established at the time a state court renders its final judgment of conviction is a question as to which the "federal courts must make an independent evaluation." *Id.,* at 305 (O'CONNOR, J., concurring in judgment); accord, *id.,* at 307 (KENNEDY, J., concurring in judgment).

It has been urged, in contrast, that we should read *Teague* and its progeny to encompass a broader principle of deference requiring federal courts to "validat[e] 'reasonable, good-faith interpretations' of the law" by state courts.

Brief for California et al. as *Amici Curiae* 6 (quoting *Butler* v. *McKellar*, 494 U. S. 407, 414 (1990)). The position has been bolstered with references to our statements elucidating the "new rule" inquiry as one turning on whether "reasonable jurists" would agree the rule was not clearly established. *Sawyer* v. *Smith*, 497 U. S. 227, 234 (1990). This presumption of deference was in essence the position taken by three Members of this Court in *Wright*, 505 U. S., at 290–291 (opinion of THOMAS, J.) ("[A] federal habeas court 'must defer to the state court's decision rejecting the claim unless that decision is patently unreasonable'") (quoting *Butler*, 494 U. S., at 422 (Brennan, J., dissenting)).

*Teague*, however, does not extend this far. The often repeated language that *Teague* endorses "reasonable, good-faith interpretations" by state courts is an explanation of policy, not a statement of law. The *Teague* cases reflect this Court's view that habeas corpus is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals. On the contrary, we have long insisted that federal habeas courts attend closely to those considered decisions, and give them full effect when their findings and judgments are consistent with federal law. See *Thompson* v. *Keohane*, 516 U. S. 99, 107–116 (1995). But as JUSTICE O'CONNOR explained in *Wright:*

> "[T]he duty of the federal court in evaluating whether a rule is 'new' is not the same as deference; . . . *Teague* does not direct federal courts to spend less time or effort scrutinizing the existing federal law, on the ground that they can assume the state courts interpreted it properly. . . .
>
> "[T]he maxim that federal courts should 'give great weight to the considered conclusions of a coequal state judiciary' . . . does not mean that we have held in the past that federal courts must presume the correctness

of a state court's legal conclusions on habeas, or that a state court's incorrect legal determination has ever been allowed to stand because it was reasonable. We have always held that federal courts, even on habeas, have an independent obligation to say what the law is." 505 U. S., at 305 (opinion concurring in judgment).

We are convinced that in the phrase, "clearly established law," Congress did not intend to modify that independent obligation.

*The "contrary to, or an unreasonable application of," requirement*

The message that Congress intended to convey by using the phrases "contrary to" and "unreasonable application of" is not entirely clear. The prevailing view in the Circuits is that the former phrase requires *de novo* review of "pure" questions of law and the latter requires some sort of "reasonability" review of so-called mixed questions of law and fact. See, *e. g., Neelley* v. *Nagle,* 138 F. 3d 917 (CA11 1998); *Drinkard* v. *Johnson,* 97 F. 3d 751 (CA5 1996); *Lindh* v. *Murphy,* 96 F. 3d 856 (CA7 1996) (en banc), rev'd on other grounds, 521 U. S. 320 (1997).

We are not persuaded that the phrases define two mutually exclusive categories of questions. Most constitutional questions that arise in habeas corpus proceedings—and therefore most "decisions" to be made—require the federal judge to apply a rule of law to a set of facts, some of which may be disputed and some undisputed. For example, an erroneous conclusion that particular circumstances established the voluntariness of a confession, or that there exists a conflict of interest when one attorney represents multiple defendants, may well be described either as "contrary to" or as an "unreasonable application of" the governing rule of law. Cf. *Miller* v. *Fenton,* 474 U. S. 104, 116 (1985); *Cuyler* v. *Sullivan,* 446 U. S. 335, 341–342 (1980). In constitutional adjudication, as in the common law, rules of law often develop

incrementally as earlier decisions are applied to new factual situations.  See *Wright*, 505 U. S., at 307 (KENNEDY, J., concurring in judgment).  But rules that depend upon such elaboration are hardly less lawlike than those that establish a bright-line test.

Indeed, our pre-AEDPA efforts to distinguish questions of fact, questions of law, and "mixed questions," and to create an appropriate standard of habeas review for each, generated some not insubstantial differences of opinion as to which issues of law fell into which category of question, and as to which standard of review applied to each.  See *Thompson*, 516 U. S., at 110–111 (acknowledging "'that the Court has not charted an entirely clear course in this area'" and that "the proper characterization of a question as one of fact or law is sometimes slippery") (quoting *Miller*, 474 U. S., at 113).  We thus think the Fourth Circuit was correct when it attributed the lack of clarity in the statute, in part, to the overlapping meanings of the phrases "contrary to" and "unreasonable application of."  See *Green*, 143 F. 3d, at 870.

The statutory text likewise does not obviously prescribe a specific, recognizable standard of review for dealing with either phrase.  Significantly, it does not use any term, such as *"de novo"* or "plain error," that would easily identify a familiar standard of review.  Rather, the text is fairly read simply as a command that a federal court not issue the habeas writ unless the state court was wrong as a matter of law or unreasonable in its application of law in a given case. The suggestion that a wrong state-court "decision"—a legal judgment rendered "after consideration of *facts, and . . . law,*" Black's Law Dictionary 407 (6th ed. 1990) (emphasis added)—may no longer be redressed through habeas (because it is unreachable under the "unreasonable application" phrase) is based on a mistaken insistence that the § 2254(d)(1) phrases have not only independent, but mutually exclusive, meanings.  Whether or not a federal court can issue the writ "under [the] 'unreasonable application' clause," the statute is

clear that habeas may issue under § 2254(d)(1) if a state-court "decision" is "contrary to . . . clearly established Federal law." We thus anticipate that there will be a variety of cases, like this one, in which both phrases may be implicated.

Even though we cannot conclude that the phrases establish "a body of rigid rules," they do express a "mood" that the Federal Judiciary must respect. *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474, 487 (1951). In this respect, it seems clear that Congress intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ. Likewise, the statute in a separate provision provides for the habeas remedy when a state-court decision "was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding.*" 28 U. S. C. § 2254(d)(2) (1994 ed., Supp. III) (emphasis added). While this provision is not before us in this case, it provides relevant context for our interpretation of § 2254(d)(1); in this respect, it bolsters our conviction that federal habeas courts must make as the starting point of their analysis the state courts' determinations of fact, including that aspect of a "mixed question" that rests on a finding of fact. AEDPA plainly sought to ensure a level of "deference to the determinations of state courts," provided those determinations did not conflict with federal law or apply federal law in an unreasonable way. H. R. Conf. Rep. No. 104–518, p. 111 (1996). Congress wished to curb delays, to prevent "retrials" on federal habeas, and to give effect to state convictions to the extent possible under law. When federal courts are able to fulfill these goals within the bounds of the law, AEDPA instructs them to do so.

On the other hand, it is significant that the word "deference" does not appear in the text of the statute itself. Neither the legislative history nor the statutory text suggests

any difference in the so-called "deference" depending on which of the two phrases is implicated.[13] Whatever "deference" Congress had in mind with respect to both phrases, it surely is not a requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error. As Judge Easterbrook noted with respect to the phrase "contrary to":

> "Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails." *Lindh*, 96 F. 3d, at 869.[14]

---

[13] As Judge Easterbrook has noted, the statute surely does not require the kind of "deference" appropriate in other contexts: "It does not tell us to 'defer' to state decisions, as if the Constitution means one thing in Wisconsin and another in Indiana. Nor does it tell us to treat state courts the way we treat federal administrative agencies. Deference after the fashion of *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837 . . . (1984), depends on delegation. See *Adams Fruit Co. v. Barrett*, 494 U. S. 638 . . . (1990). Congress did not delegate either interpretive or executive power to the state courts. They exercise powers under their domestic law, constrained by the Constitution of the United States. 'Deference' to the jurisdictions bound by those constraints is not sensible." *Lindh v. Murphy*, 96 F. 3d 856, 868 (CA7 1996) (en banc), rev'd on other grounds, 521 U. S. 320 (1997).

[14] The Court advances three reasons for adopting its alternative construction of the phrase "unreasonable application of." First, the use of the word "unreasonable" in the statute suggests that Congress was directly influenced by the "patently unreasonable" standard advocated by JUSTICE THOMAS in his opinion in *Wright v. West*, 505 U. S. 277, 287 (1992), *post*, at 411–412; second, the legislative history supports this view, see *post*, at 408, n.; and third, Congress must have intended to change the law more substantially than our reading of 28 U. S. C. §2254(d)(1) (1994 ed., Supp. III) permits.

None of these reasons is persuasive. First, even though, as the Court recognizes, the term "unreasonable" is "difficult to define," *post*, at 410, neither the statute itself nor the Court's explanation of it suggests that

Our disagreement with the Court about the precise meaning of the phrase "contrary to," and the word "unreasonable," is, of course, important, but should affect only a narrow category of cases. The simplest and first definition of "contrary to" as a phrase is "in conflict with." Webster's

---

AEDPA's "unreasonable application of" has the same meaning as JUSTICE THOMAS' "'patently unreasonable'" standard mentioned in his dictum in *Wright.* 505 U. S., at 291 (quoting *Butler* v. *McKellar*, 494 U. S. 407, 422 (1990) (Brennan, J., dissenting)). To the extent the "broader debate" in *Wright* touched upon the Court's novel distinction today between what is "wrong" and what is "unreasonable," it was in the context of a discussion not about the *standard of review* habeas courts should use for law-application questions, but about whether a rule is "new" or "old" such that *Teague*'s retroactivity rule would bar habeas relief; JUSTICE THOMAS contended that *Teague* barred habeas "whenever the state courts have interpreted old precedents *reasonably*, not [as JUSTICE O'CONNOR suggested] only when they have done so 'properly.'" 505 U. S., at 291–292, n. 8. *Teague*, of course, as JUSTICE O'CONNOR correctly pointed out, "did not establish a standard of review at all," 505 U. S., at 303–304; rather than instructing a court *how* to review a claim, it simply asks, in absolute terms, *whether* a rule was clear at the time of a state-court decision. We thus do not think *Wright* "confirms" anything about the meaning of § 2254(d)(1), which is, as our division reflects, anything but "clear." *Post*, at 412.

As for the other bases for the Court's view, the only two specific citations to the legislative history upon which it relies, *post*, at 408, do no more than beg the question. One merely quotes the language of the statute without elaboration, and the other goes to slightly greater length in stating that state-court judgments must be upheld unless "unreasonable." Neither sheds any light on what the content of the hypothetical category of "decisions" that are wrong but nevertheless not "unreasonable." Finally, while we certainly agree with the Court, *post*, at 403, that AEDPA wrought substantial changes in habeas law, see *supra*, at 386; see also, *e. g.*, 28 U. S. C. § 2244(b) (1994 ed., Supp. III) (strictly limiting second or successive petitions); § 2244(d) (1-year statute of limitations for habeas petitions); § 2254(e)(2) (limiting availability of evidentiary hearings on habeas); §§ 2263, 2266 (strict deadlines for habeas court rulings), there is an obvious fallacy in the assumption that because the statute changed pre-existing law in some respects, it must have rendered this specific change here.

Ninth New Collegiate Dictionary 285 (1983). In this sense, we think the phrase surely capacious enough to include a finding that the state-court "decision" is simply "erroneous" or wrong. (We hasten to add that even "diametrically different" from, or "opposite" to, an established federal law would seem to include "decisions" that are wrong in light of that law.) And there is nothing in the phrase "contrary to"—as the Court appears to agree—that implies anything less than independent review by the federal courts. Moreover, state-court decisions that do not "conflict" with federal law will rarely be "unreasonable" under either the Court's reading of the statute or ours. We all agree that state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated. Our difference is as to the cases in which, at first blush, a state-court judgment seems entirely reasonable, but thorough analysis by a federal court produces a firm conviction that that judgment is infected by constitutional error. In our view, such an erroneous judgment is "unreasonable" within the meaning of the Act even though that conclusion was not immediately apparent.

In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody—or, as in this case, his sentence of death—violates the Constitution, that independent judgment should prevail. Otherwise the federal "law as determined by the Supreme Court of the United States" might be applied by the federal courts one way in Virginia and another way in California. In light of the well-recognized interest in ensuring that federal courts interpret federal law in a uniform

way,[15] we are convinced that Congress did not intend the statute to produce such a result.

## III

In this case, Williams contends that he was denied his constitutionally guaranteed right to the effective assistance of counsel when his trial lawyers failed to investigate and to present substantial mitigating evidence to the sentencing jury. The threshold question under AEDPA is whether Williams seeks to apply a rule of law that was clearly established at the time his state-court conviction became final. That question is easily answered because the merits of his claim are squarely governed by our holding in *Strickland* v. *Washington*, 466 U. S. 668 (1984).

We explained in *Strickland* that a violation of the right on which Williams relies has two components:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687.

To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of

---

[15] See, *e. g., Mackey* v. *United States,* 401 U. S. 667, 689 (1971); *Felker* v. *Turpin,* 518 U. S. 651, 667 (1996) (SOUTER, J., concurring). Indeed, a contrary rule would be in substantial tension with the interest in uniformity served by Congress' modification in AEDPA of our previous *Teague* jurisprudence—now the law on habeas review must be "clearly established" by this Court alone. See *supra,* at 381–382. It would thus seem somewhat perverse to ascribe to Congress the entirely inconsistent policy of perpetuating disparate readings of our decisions under the guise of deference to anything within a conceivable spectrum of reasonableness.

reasonableness." *Id.*, at 688. To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694.

It is past question that the rule set forth in *Strickland* qualifies as "clearly established Federal law, as determined by the Supreme Court of the United States." That the *Strickland* test "of necessity requires a case-by-case examination of the evidence," *Wright*, 505 U. S., at 308 (KENNEDY, J., concurring in judgment), obviates neither the clarity of the rule nor the extent to which the rule must be seen as "established" by this Court. This Court's precedent "dictated" that the Virginia Supreme Court apply the *Strickland* test at the time that court entertained Williams' ineffective-assistance claim. *Teague*, 489 U. S., at 301. And it can hardly be said that recognizing the right to effective counsel "breaks new ground or imposes a new obligation on the States," *ibid.* Williams is therefore entitled to relief if the Virginia Supreme Court's decision rejecting his ineffective-assistance claim was either "contrary to, or involved an unreasonable application of," that established law. It was both.

## IV

The Virginia Supreme Court erred in holding that our decision in *Lockhart* v. *Fretwell*, 506 U. S. 364 (1993), modified or in some way supplanted the rule set down in *Strickland*. It is true that while the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis. Thus, on the one hand, as *Strickland* itself explained, there are a few situations in which prejudice may be presumed. 466 U. S., at 692. And, on the other hand, there are also situations in which it would be unjust to characterize the

likelihood of a different outcome as legitimate "prejudice." Even if a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury. *Nix* v. *Whiteside*, 475 U. S. 157, 175–176 (1986).

Similarly, in *Lockhart*, we concluded that, given the overriding interest in fundamental fairness, the likelihood of a different outcome attributable to an incorrect interpretation of the law should be regarded as a potential "windfall" to the defendant rather than the legitimate "prejudice" contemplated by our opinion in *Strickland*. The death sentence that Arkansas had imposed on Bobby Ray Fretwell was based on an aggravating circumstance (murder committed for pecuniary gain) that duplicated an element of the underlying felony (murder in the course of a robbery). Shortly before the trial, the United States Court of Appeals for the Eighth Circuit had held that such "double counting" was impermissible, see *Collins* v. *Lockhart*, 754 F. 2d 258, 265 (1985), but Fretwell's lawyer (presumably because he was unaware of the *Collins* decision) failed to object to the use of the pecuniary gain aggravator. Before Fretwell's claim for federal habeas corpus relief reached this Court, the *Collins* case was overruled.[16] Accordingly, even though the Arkansas trial judge probably would have sustained a timely objection to the double counting, it had become clear that the State had a right to rely on the disputed aggravating circumstance. Because the ineffectiveness of Fretwell's counsel had not deprived him of any substantive or procedural right to which the law entitled him, we held that his

---

[16] In *Lowenfield* v. *Phelps*, 484 U. S. 231 (1988), we held that an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself. In *Perry* v. *Lockhart*, 871 F. 2d 1384 (1989), the Eighth Circuit correctly decided that our decision in *Lowenfield* required it to overrule *Collins*.

claim did not satisfy the "prejudice" component of the *Strickland* test.[17]

Cases such as *Nix* v. *Whiteside*, 475 U. S. 157 (1986), and *Lockhart* v. *Fretwell*, 506 U. S. 364 (1993), do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him.[18]  In the instant case, it is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.

Nevertheless, the Virginia Supreme Court read our decision in *Lockhart* to require a separate inquiry into fundamental fairness even when Williams is able to show that his lawyer was ineffective and that his ineffectiveness probably affected the outcome of the proceeding.  It wrote:

---

[17] "But the 'prejudice' component of the *Strickland* test does not implicate these concerns.  It focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.  [466 U. S., at 687]; see *Kimmelman*, 477 U. S., at 393 (Powell, J., concurring).  Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.  As we have noted, it was the premise of our grant in this case that *Perry* was correctly decided, *i. e.*, that respondent was not entitled to an objection based on 'double counting.'  Respondent therefore suffered no prejudice from his counsel's deficient performance." *Lockhart* v. *Fretwell*, 506 U. S. 364, 372 (1993).

[18] In her concurring opinion in *Lockhart*, JUSTICE O'CONNOR stressed this precise point.  "I write separately only to point out that today's decision will, in the vast majority of cases, have no effect on the prejudice inquiry under *Strickland* v. *Washington*, 466 U. S. 668 (1984).  The determinative question—whether there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' *id.*, at 694—remains unchanged.  This case, however, concerns the unusual circumstance where the defendant attempts to demonstrate prejudice based on considerations that, as a matter of law, ought not inform the inquiry." *Id.*, at 373.

" 'The prisoner argues there 'is a "reasonable probability" that at least one juror would have been moved to spare Petitioner's life had he heard' the mitigation evidence developed at the habeas hearing that was not presented at the trial. Summarizing, he contends there 'is a "reasonable probability" that had at least one juror heard *any* of this evidence—let alone all of this evidence—the outcome of this case would have been different.'

"We reject these contentions. The prisoner's discussion flies in the face of the Supreme Court's admonition in *Lockhart, supra,* that 'an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.' " 254 Va., at 25, 487 S. E. 2d, at 199.

Unlike the Virginia Supreme Court, the state trial judge omitted any reference to *Lockhart* and simply relied on our opinion in *Strickland* as stating the correct standard for judging ineffective-assistance claims. With respect to the prejudice component, he wrote:

"Even if a Petitioner shows that counsel's performance was deficient, however, he must also show prejudice. Petitioner must show 'that there is a reasonable probability that but for counsel's unprofessional errors, the result . . . would have been different.' *Strickland,* 466 U. S. at 694. 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id.* Indeed, it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding, because virtually every act or omission of counsel would meet that test. *Id.* at 693. The petitioner bears the 'highly demanding' and 'heavy burden' in establishing actual prejudice." App. 417.

The trial judge analyzed the ineffective-assistance claim under the correct standard; the Virginia Supreme Court did not.

We are likewise persuaded that the Virginia trial judge correctly applied both components of that standard to Williams' ineffectiveness claim. Although he concluded that counsel competently handled the guilt phase of the trial, he found that their representation during the sentencing phase fell short of professional standards—a judgment barely disputed by the State in its brief to this Court. The record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before the trial. *Id.*, at 207, 227. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings,[19] that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

---

[19] Juvenile records contained the following description of his home:

"The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey." App. 528–529.

Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. *Id.,* at 595. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." *Id.,* at 569, 588. Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison. *Id.,* at 563–566.

Of course, not all of the additional evidence was favorable to Williams. The juvenile records revealed that he had been thrice committed to the juvenile system—for aiding and abetting larceny when he was 11 years old, for pulling a false fire alarm when he was 12, and for breaking and entering when he was 15. *Id.,* at 534–536. But as the Federal District Court correctly observed, the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession. Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background. See 1 ABA Standards for Criminal Justice 4–4.1, commentary, p. 4–55 (2d ed. 1980).

We are also persuaded, unlike the Virginia Supreme Court, that counsel's unprofessional service prejudiced Williams within the meaning of *Strickland.* After hearing the additional evidence developed in the postconviction proceedings, the very judge who presided at Williams' trial, and who once

determined that the death penalty was "just" and "appropriate," concluded that there existed "a reasonable probability that the result of the sentencing phase would have been different" if the jury had heard that evidence. App. 429. We do not agree with the Virginia Supreme Court that Judge Ingram's conclusion should be discounted because he apparently adopted "a *per se* approach to the prejudice element" that placed undue "emphasis on mere outcome determination." 254 Va., at 26–27, 487 S. E. 2d, at 200. Judge Ingram did stress the importance of mitigation evidence in making his "outcome determination," but it is clear that his predictive judgment rested on his assessment of the totality of the omitted evidence rather than on the notion that a single item of omitted evidence, no matter how trivial, would require a new hearing.

The Virginia Supreme Court's own analysis of prejudice reaching the contrary conclusion was thus unreasonable in at least two respects. First, as we have already explained, the State Supreme Court mischaracterized at best the appropriate rule, made clear by this Court in *Strickland*, for determining whether counsel's assistance was effective within the meaning of the Constitution. While it may also have conducted an "outcome determinative" analysis of its own, 254 Va., at 27, 487 S. E. 2d, at 200, it is evident to us that the court's decision turned on its erroneous view that a "mere" difference in outcome is not sufficient to establish constitutionally ineffective assistance of counsel. See *supra*, at 394. Its analysis in this respect was thus not only "contrary to," but also, inasmuch as the Virginia Supreme Court relied on the inapplicable exception recognized in *Lockhart*, an "unreasonable application of" the clear law as established by this Court.

Second, the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas pro-

ceeding—in reweighing it against the evidence in aggravation. See *Clemons* v. *Mississippi*, 494 U. S. 738, 751–752 (1990). This error is apparent in its consideration of the additional mitigation evidence developed in the postconviction proceedings. The court correctly found that as to "the factual part of the mixed question," there was "really . . . n[o] . . . dispute" that available mitigation evidence was not presented at trial. 254 Va., at 24, 487 S. E. 2d, at 198. As to the prejudice determination comprising the "legal part" of its analysis, *id.*, at 23–25, 487 S. E. 2d, at 198–199, it correctly emphasized the strength of the prosecution evidence supporting the future dangerousness aggravating circumstance.

But the state court failed even to mention the sole argument in mitigation that trial counsel did advance—Williams turned himself in, alerting police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that. While this, coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability. See *Boyde* v. *California*, 494 U. S. 370, 387 (1990). The circumstances recited in his several confessions are consistent with the view that in each case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation. Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case. The Virginia Supreme Court did not entertain that possibility. It thus failed to accord appropriate weight to the body of mitigation evidence available to trial counsel.

## V

In our judgment, the state trial judge was correct both in his recognition of the established legal standard for deter-

mining counsel's effectiveness, and in his conclusion that the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised "a reasonable probability that the result of the sentencing proceeding would have been different" if competent counsel had presented and explained the significance of all the available evidence. It follows that the Virginia Supreme Court rendered a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." Williams' constitutional right to the effective assistance of counsel as defined in *Strickland* v. *Washington*, 466 U. S. 668 (1984), was violated.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE O'CONNOR delivered the opinion of the Court with respect to Part II (except as to the footnote), concurred in part, and concurred in the judgment.*

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act (AEDPA). In that Act, Congress placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners. The relevant provision, 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. III), prohibits a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The Court holds today that the Virginia Supreme Court's adjudication

---

*JUSTICE KENNEDY joins this opinion in its entirety. THE CHIEF JUSTICE and JUSTICE THOMAS join this opinion with respect to Part II. JUSTICE SCALIA joins this opinion with respect to Part II, except as to the footnote, *infra*, at 408.

of Terry Williams' application for state habeas corpus relief resulted in just such a decision. I agree with that determination and join Parts I, III, and IV of the Court's opinion. Because I disagree, however, with the interpretation of § 2254(d)(1) set forth in Part II of JUSTICE STEVENS' opinion, I write separately to explain my views.

## I

Before 1996, this Court held that a federal court entertaining a state prisoner's application for habeas relief must exercise its independent judgment when deciding both questions of constitutional law and mixed constitutional questions (*i. e.,* application of constitutional law to fact). See, *e. g., Miller* v. *Fenton,* 474 U. S. 104, 112 (1985). In other words, a federal habeas court owed no deference to a state court's resolution of such questions of law or mixed questions. In 1991, in the case of *Wright* v. *West,* 502 U. S. 1021, we revisited our prior holdings by asking the parties to address the following question in their briefs:

> "In determining whether to grant a petition for writ of habeas corpus by a person in custody pursuant to the judgment of a state court, should a federal court give deference to the state court's application of law to the specific facts of the petitioner's case or should it review the state court's determination *de novo?*" *Ibid.*

Although our ultimate decision did not turn on the answer to that question, our several opinions did join issue on it. See *Wright* v. *West,* 505 U. S. 277 (1992).

JUSTICE THOMAS, announcing the judgment of the Court, acknowledged that our precedents had "treat[ed] as settled the rule that mixed constitutional questions are 'subject to plenary federal review' on habeas." *Id.,* at 289 (quoting *Miller, supra,* at 112). He contended, nevertheless, that those decisions did not foreclose the Court from applying a rule of deferential review for reasonableness in future cases.

See 505 U. S., at 287–290. According to JUSTICE THOMAS, the reliance of our precedents on *Brown* v. *Allen,* 344 U. S. 443 (1953), was erroneous because the Court in *Brown* never explored in detail whether a federal habeas court, to deny a state prisoner's application, must conclude that the relevant state-court adjudication was "correct" or merely that it was "reasonable." *Wright, supra,* at 287. JUSTICE THOMAS suggested that the time to revisit our decisions may have been at hand, given that our more recent habeas jurisprudence in the nonretroactivity context, see, *e. g., Teague* v. *Lane,* 489 U. S. 288 (1989), had called into question the then-settled rule of independent review of mixed constitutional questions. *Wright,* 505 U. S., at 291–292, 294.

I wrote separately in *Wright* because I believed JUSTICE THOMAS had "understate[d] the certainty with which *Brown* v. *Allen* rejected a deferential standard of review of issues of law." *Id.,* at 300. I also explained that we had considered the standard of review applicable to mixed constitutional questions on numerous occasions and each time we concluded that federal habeas courts had a duty to evaluate such questions independently. *Id.,* at 301–303. With respect to JUSTICE THOMAS' suggestion that *Teague* and its progeny called into question the vitality of the independent-review rule, I noted that *"Teague* did not establish a 'deferential' standard of review" because "[i]t did not establish a standard of review at all." 505 U. S., at 303–304. While *Teague* did hold that state prisoners could not receive "the retroactive benefit of new rules of law," it "did *not* create any deferential standard of review with regard to old rules." 505 U. S., at 304 (emphasis in original).

Finally, and perhaps most importantly for purposes of today's case, I stated my disagreement with JUSTICE THOMAS' suggestion that *de novo* review is incompatible with the maxim that federal habeas courts should "give great weight to the considered conclusions of a coequal state judiciary," *Miller, supra,* at 112. Our statement in *Miller* signified

only that a state-court decision is due the same respect as any other "persuasive, well-reasoned authority." *Wright*, 505 U. S., at 305. "But this does not mean that we have held in the past that federal courts must presume the correctness of a state court's legal conclusions on habeas, or that a state court's incorrect legal determination has ever been allowed to stand because it was reasonable. We have always held that federal courts, even on habeas, have an independent obligation to say what the law is." *Ibid.* Under the federal habeas statute as it stood in 1992, then, our precedents dictated that a federal court should grant a state prisoner's petition for habeas relief if that court were to conclude in its independent judgment that the relevant state court had erred on a question of constitutional law or on a mixed constitutional question.

If today's case were governed by the federal habeas statute prior to Congress' enactment of AEDPA in 1996, I would agree with JUSTICE STEVENS that Williams' petition for habeas relief must be granted if we, in our independent judgment, were to conclude that his Sixth Amendment right to effective assistance of counsel was violated. See *ante*, at 389.

## II

### A

Williams' case is *not* governed by the pre-1996 version of the habeas statute. Because he filed his petition in December 1997, Williams' case is governed by the statute as amended by AEDPA. Section 2254 now provides:

> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly estab-

lished Federal law, as determined by the Supreme Court of the United States."

Accordingly, for Williams to obtain federal habeas relief, he must first demonstrate that his case satisfies the condition set by §2254(d)(1). That provision modifies the role of federal habeas courts in reviewing petitions filed by state prisoners.

JUSTICE STEVENS' opinion in Part II essentially contends that §2254(d)(1) does not alter the previously settled rule of independent review. Indeed, the opinion concludes its statutory inquiry with the somewhat empty finding that §2254(d)(1) does no more than express a "'mood' that the Federal Judiciary must respect." *Ante,* at 386. For JUSTICE STEVENS, the congressionally enacted "mood" has two important qualities. First, "federal courts [must] attend to every state-court judgment with utmost care" by "carefully weighing all the reasons for accepting a state court's judgment." *Ante,* at 389. Second, if a federal court undertakes that careful review and yet remains convinced that a prisoner's custody violates the Constitution, "that independent judgment should prevail." *Ibid.*

One need look no further than our decision in *Miller* to see that JUSTICE STEVENS' interpretation of §2254(d)(1) gives the 1996 amendment no effect whatsoever. The command that federal courts should now use the "utmost care" by "carefully weighing" the reasons supporting a state court's judgment echoes our pre-AEDPA statement in *Miller* that federal habeas courts "should, of course, give great weight to the considered conclusions of a coequal state judiciary." 474 U. S., at 112. Similarly, the requirement that the independent judgment of a federal court must in the end prevail essentially repeats the conclusion we reached in the very next sentence in *Miller* with respect to the specific issue presented there: "But, as we now reaffirm, the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compat-

ible with the requirements of the Constitution *is a matter for independent federal determination." Ibid.* (emphasis added).

That JUSTICE STEVENS would find the new § 2254(d)(1) to have *no* effect on the prior law of habeas corpus is remarkable given his apparent acknowledgment that Congress wished to bring change to the field. See *ante,* at 386 ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law"). That acknowledgment is correct and significant to this case. It cannot be disputed that Congress viewed § 2254(d)(1) as an important means by which its goals for habeas reform would be achieved.

JUSTICE STEVENS arrives at his erroneous interpretation by means of one critical misstep. He fails to give independent meaning to both the "contrary to" and "unreasonable application" clauses of the statute. See, *e. g., ante,* at 384 ("We are not persuaded that the phrases define two mutually exclusive categories of questions"). By reading § 2254(d)(1) as one general restriction on the power of the federal habeas court, JUSTICE STEVENS manages to avoid confronting the specific meaning of the statute's "unreasonable application" clause and its ramifications for the independent-review rule. It is, however, a cardinal principle of statutory construction that we must " 'give effect, if possible, to every clause and word of a statute.'" *United States* v. *Menasche,* 348 U. S. 528, 538–539 (1955) (quoting *Montclair* v. *Ramsdell,* 107 U. S. 147, 152 (1883)). Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) *"contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) *"involved an unreasonable application of* . . . clearly

established Federal law, as determined by the Supreme Court of the United States." (Emphases added.)

The Court of Appeals for the Fourth Circuit properly accorded both the "contrary to" and "unreasonable application" clauses independent meaning. The Fourth Circuit's interpretation of § 2254(d)(1) in Williams' case relied, in turn, on that court's previous decision in *Green* v. *French,* 143 F. 3d 865 (1998), cert. denied, 525 U. S. 1090 (1999). See 163 F. 3d 860, 866 (CA4 1998) ("[T]he standard of review enunciated in *Green v. French* continues to be the binding law of this Circuit"). With respect to the first of the two statutory clauses, the Fourth Circuit held in *Green* that a state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours. See 143 F. 3d, at 869–870.

The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland* v. *Washington,* 466 U. S. 668 (1984). If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the

prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different." *Id.*, at 694. A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

JUSTICE STEVENS would instead construe §2254(d)(1)'s "contrary to" clause to encompass such a routine state-court decision. That construction, however, saps the "unreasonable application" clause of any meaning. If a federal habeas court can, under the "contrary to" clause, issue the writ whenever it concludes that the state court's *application* of clearly established federal law was incorrect, the "unreasonable application" clause becomes a nullity. We must, however, if possible, give meaning to every clause of the statute. JUSTICE STEVENS not only makes no attempt to do so, but also construes the "contrary to" clause in a manner that ensures that the "unreasonable application" clause will have no independent meaning. See *ante*, at 385–386, 388–390. We reject that expansive interpretation of the statute. Reading §2254(d)(1)'s "contrary to" clause to permit a federal court to grant relief in cases where a state court's error is limited to the manner in which it *applies* Supreme Court precedent is suspect given the logical and natural fit of the neighboring "unreasonable application" clause to such cases.

The Fourth Circuit's interpretation of the "unreasonable application" clause of §2254(d)(1) is generally correct. That court held in *Green* that a state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. See 143 F. 3d, at 869–870.

A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a

particular prisoner's case certainly would qualify as a decision "involv[ing] an unreasonable application of . . . clearly established Federal law." Indeed, we used the almost identical phrase "application of law" to describe a state court's application of law to fact in the certiorari question we posed to the parties in *Wright.\**

The Fourth Circuit also held in *Green* that state-court decisions that unreasonably extend a legal principle from our precedent to a new context where it should not apply (or unreasonably refuse to extend a legal principle to a new context where it should apply) should be analyzed under § 2254(d)(1)'s "unreasonable application" clause. See 143 F. 3d, at 869–870. Although that holding may perhaps be correct, the classification does have some problems of precision. Just as it is sometimes difficult to distinguish a mixed question of law and fact from a question of fact, it will often be difficult to identify separately those state-court decisions that involve an unreasonable application of a legal principle (or an unreasonable failure to apply a legal principle) to a new context. Indeed, on the one hand, in some cases it will be hard to distinguish a decision involving an unreasonable extension of a legal principle from a decision involving an unreasonable application of law to facts. On the other hand, in many of the same cases it will also be difficult to distinguish a decision involving an unreasonable extension of a legal principle from a decision that "arrives at a conclusion opposite to that reached by this Court on a question of law," *supra*, at 405. Today's case does not require us to decide how

---

\*The legislative history of § 2254(d)(1) also supports this interpretation. See, *e. g.,* 142 Cong. Rec. 7799 (1996) (remarks of Sen. Specter) ("[U]nder the bill deference will be owed to State courts' decisions on the application of Federal law to the facts. Unless it is unreasonable, a State court's decision applying the law to the facts will be upheld"); 141 Cong. Rec. 14666 (1995) (remarks of Sen. Hatch) ("[W]e allow a Federal court to overturn a State court decision only if it is contrary to clearly established Federal law or if it involves an 'unreasonable application' of clearly established Federal law to the facts").

such "extension of legal principle" cases should be treated under § 2254(d)(1). For now it is sufficient to hold that when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's "unreasonable application" clause.

## B

There remains the task of defining what exactly qualifies as an "unreasonable application" of law under § 2254(d)(1). The Fourth Circuit held in *Green* that a state-court decision involves an "unreasonable application of . . . clearly established Federal law" only if the state court has applied federal law "in a manner that reasonable jurists would all agree is unreasonable." 143 F. 3d, at 870. The placement of this additional overlay on the "unreasonable application" clause was erroneous. It is difficult to fault the Fourth Circuit for using this language given the fact that we have employed nearly identical terminology to describe the related inquiry undertaken by federal courts in applying the nonretroactivity rule of *Teague.* For example, in *Lambrix* v. *Singletary,* 520 U. S. 518 (1997), we stated that a new rule is not dictated by precedent unless it would be "apparent to *all reasonable jurists.*" *Id.,* at 528 (emphasis added). In *Graham* v. *Collins,* 506 U. S. 461 (1993), another nonretroactivity case, we employed similar language, stating that we could not say "that *all reasonable jurists* would have deemed themselves compelled to accept Graham's claim in 1984." *Id.,* at 477 (emphasis added).

Defining an "unreasonable application" by reference to a "reasonable jurist," however, is of little assistance to the courts that must apply § 2254(d)(1) and, in fact, may be misleading. Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court

should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. The "all reasonable jurists" standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one. For example, the Fifth Circuit appears to have applied its "reasonable jurist" standard in just such a subjective manner. See *Drinkard* v. *Johnson*, 97 F. 3d 751, 769 (1996) (holding that state court's application of federal law was not unreasonable because the Fifth Circuit panel split 2–1 on the underlying mixed constitutional question), cert. denied, 520 U. S. 1107 (1997). As I explained in *Wright* with respect to the "reasonable jurist" standard in the *Teague* context, "[e]ven though we have characterized the new rule inquiry as whether 'reasonable jurists' could disagree as to whether a result is dictated by precedent, the standard for determining when a case establishes a new rule is 'objective,' and the mere existence of conflicting authority does not necessarily mean a rule is new." 505 U. S., at 304 (citation omitted).

The term "unreasonable" is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning. For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. Our opinions in *Wright*, for example, make that difference clear. JUSTICE THOMAS' criticism of this Court's subsequent reliance on *Brown* turned on that distinction. The Court in *Brown*, JUSTICE THOMAS contended, held only that a federal habeas court must determine whether the relevant state-court adjudication resulted in a "'satisfactory conclusion.'" 505 U. S., at 287 (quoting *Brown*, 344 U. S., at 463). In JUSTICE THOMAS' view, *Brown* did not answer "the question whether a 'satisfactory' conclusion was one that the habeas court considered

*correct,* as opposed to merely *reasonable."* 505 U. S., at 287 (emphases in original). In my separate opinion in *Wright,* I made the same distinction, maintaining that "a state court's *incorrect* legal determination has [never] been allowed to stand because it was *reasonable.* We have always held that federal courts, even on habeas, have an independent obligation to say what the law is." *Id.,* at 305 (emphases added). In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Justice Stevens turns a blind eye to the debate in *Wright* because he finds no indication in § 2254(d)(1) itself that Congress was "directly influenced" by Justice Thomas' opinion in *Wright. Ante,* at 387–388, n. 14. As Justice Stevens himself apparently recognizes, however, Congress need not mention a prior decision of this Court by name in a statute's text in order to adopt either a rule or a meaning given a certain term in that decision. See *ante,* at 380, n. 11. In any event, whether Congress intended to codify the standard of review suggested by Justice Thomas in *Wright* is beside the point. *Wright* is important for the light it sheds on § 2254(d)(1)'s requirement that a federal habeas court inquire into the reasonableness of a state court's application of clearly established federal law. The separate opinions in *Wright* concerned the very issue addressed by § 2254(d)(1)'s "unreasonable application" clause—whether, in reviewing a state-court decision on a state prisoner's claims under federal law, a federal habeas court should ask whether the state-court decision was correct or simply whether it was reasonable. Justice Stevens' claim that the debate in *Wright* concerned only the meaning of the *Teague* nonretro-

activity rule is simply incorrect.    See *ante,* at 387–388, n. 14. As even a cursory review of JUSTICE THOMAS' opinion and my own opinion reveals, both the broader debate and the specific statements to which we refer, see *supra,* at 410–411, concerned precisely the issue of the standard of review to be employed by federal habeas courts.    The *Wright* opinions confirm what § 2254(d)(1)'s language already makes clear— that an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.

Throughout this discussion the meaning of the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" has been put to the side. That statutory phrase refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.    In this respect, the "clearly established Federal law" phrase bears only a slight connection to our *Teague* jurisprudence.    With one caveat, whatever would qualify as an old rule under our *Teague* jurisprudence will constitute "clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1).    See, *e. g., Stringer* v. *Black,* 503 U. S. 222, 228 (1992) (using term "old rule").    The one caveat, as the statutory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence.

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.    Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."    Under the "contrary to"

clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

## III

Although I disagree with JUSTICE STEVENS concerning the standard we must apply under § 2254(d)(1) in evaluating Terry Williams' claims on habeas, I agree with the Court that the Virginia Supreme Court's adjudication of Williams' claim of ineffective assistance of counsel resulted in a decision that was both contrary to and involved an unreasonable application of this Court's clearly established precedent. Specifically, I believe that the Court's discussion in Parts III and IV is correct and that it demonstrates the reasons that the Virginia Supreme Court's decision in Williams' case, even under the interpretation of § 2254(d)(1) I have set forth above, was both contrary to and involved an unreasonable application of our precedent.

First, I agree with the Court that our decision in *Strickland* undoubtedly qualifies as "clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of § 2254(d)(1). See *ante*, at 390–391. Second, I agree that the Virginia Supreme Court's decision was contrary to that clearly established federal law to the extent it held that our decision in *Lockhart* v. *Fretwell*, 506 U. S. 364 (1993), somehow modified or supplanted the rule set forth in *Strickland*. See *ante*, at 391–395, 397. Specifically, the Virginia Supreme Court's decision was contrary to *Strickland* itself, where we held that a defendant demonstrates prejudice by showing "that there is a reason-

able probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U. S., at 694. The Virginia Supreme Court held, in contrast, that such a focus on outcome determination was insufficient standing alone. See *Williams* v. *Warden of Mecklenburg Correctional Center,* 254 Va. 16, 25, 27, 487 S. E. 2d 194, 199, 200 (1997). *Lockhart* does not support that broad proposition. As I explained in my concurring opinion in that case, "in the vast majority of cases . . . [t]he determinative question—whether there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'—remains unchanged." 506 U. S., at 373 (quoting *Strickland,* 466 U. S., at 694). In his attempt to demonstrate prejudice, Williams did not rely on any "considerations that, as a matter of law, ought not inform the [prejudice] inquiry." *Lockhart, supra,* at 373 (O'CONNOR, J., concurring). Accordingly, as the Court ably explains, the Virginia Supreme Court's decision was contrary to *Strickland.*

To be sure, as THE CHIEF JUSTICE notes, *post,* at 417–418 (opinion concurring in part and dissenting in part), the Virginia Supreme Court did also inquire whether Williams had demonstrated a reasonable probability that, but for his trial counsel's unprofessional errors, the result of his sentencing would have been different. See 254 Va., at 25–26, 487 S. E. 2d, at 199–200. It is impossible to determine, however, the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding that Williams suffered no prejudice. For example, at the conclusion of its discussion of whether Williams had demonstrated a reasonable probability of a different outcome at sentencing, the Virginia Supreme Court faulted the Virginia Circuit Court for its "emphasis on mere outcome determination, without proper attention to whether the result of the criminal proceeding was fundamentally unfair or unreliable." 254 Va., at 27, 487 S. E. 2d, at 200. As the Court explains,

however, see *ante*, at 393, Williams' case did not implicate the unusual circumstances present in cases like *Lockhart* or *Nix* v. *Whiteside*, 475 U. S. 157 (1986). Accordingly, for the very reasons I set forth in my *Lockhart* concurrence, the emphasis on outcome was entirely appropriate in Williams' case.

Third, I also agree with the Court that, to the extent the Virginia Supreme Court did apply *Strickland*, its application was unreasonable. See *ante*, at 395–398. As the Court correctly recounts, Williams' trial counsel failed to conduct an investigation that would have uncovered substantial amounts of mitigation evidence. See *ante*, at 395–396. For example, speaking only of that evidence concerning Williams' "nightmarish childhood," *ante*, at 395, the mitigation evidence that trial counsel failed to present to the jury showed that "Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody," *ibid.* (footnote omitted). See also *ante*, at 395, n. 19. The consequence of counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances manifested itself during his generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life. More generally, the Virginia Circuit Court found that Williams' trial counsel failed to present evidence showing that Williams "had a deprived and abused upbringing; that he may have been a neglected and mistreated child; that he came from an alcoholic family; . . . that he was borderline mentally retarded;" and that "[his] conduct had been good in certain structured settings in his life (such as when he was incarcerated)." App. 422–423. In addition, the Circuit

Court noted the existence of "friends, neighbors and family of [Williams] who would have testified that he had redeeming qualities." *Id.*, at 423. Based on its consideration of all of this evidence, the same trial judge that originally found Williams' death sentence " 'justified and warranted,' " *id.*, at 155, concluded that trial counsel's deficient performance prejudiced Williams, *id.*, at 424, and accordingly recommended that Williams be granted a new sentencing hearing, *ibid.* The Virginia Supreme Court's decision reveals an obvious failure to consider the totality of the omitted mitigation evidence. See 254 Va., at 26, 487 S. E. 2d, at 200 ("At most, this evidence would have shown that numerous people, mostly relatives, thought that [Williams] was nonviolent and could cope very well in a structured environment"). For that reason, and the remaining factors discussed in the Court's opinion, I believe that the Virginia Supreme Court's decision "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."

Accordingly, although I disagree with the interpretation of § 2254(d)(1) set forth in Part II of JUSTICE STEVENS' opinion, I join Parts I, III, and IV of the Court's opinion and concur in the judgment of reversal.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, concurring in part and dissenting in part.

I agree with the Court's interpretation of 28 U. S. C. § 2254(d)(1) (1994 ed., Supp. III), see *ante*, at 402–413 (opinion of O'CONNOR, J.), but disagree with its decision to grant habeas relief in this case.

There is "clearly established Federal law, as determined by [this Court]" that governs petitioner's claim of ineffective assistance of counsel: *Strickland* v. *Washington*, 466 U. S. 668 (1984). Thus, we must determine whether the Virginia

Supreme Court's adjudication was "contrary to" or an "unreasonable application of" *Strickland*.

Generally, in an ineffective-assistance-of-counsel case where the state court applies *Strickland*, federal habeas courts can proceed directly to "unreasonable application" review. But, according to the substance of petitioner's argument, this could be one of the rare cases where a state court applied the wrong Supreme Court precedent, and, consequently, reached an incorrect result. Petitioner argues, and the Court agrees, that the Virginia Supreme Court improperly held that *Lockhart* v. *Fretwell*, 506 U. S. 364 (1993), "modified or in some way supplanted" the rule set down in *Strickland*. See *ante*, at 391. I agree that such a holding would be improper. But the Virginia Supreme Court did not so hold as it did not rely on *Lockhart* to reach its decision.

Before delving into the evidence presented at the sentencing proceeding, the Virginia Supreme Court stated:

> "We shall demonstrate that the criminal proceeding sentencing defendant to death was not fundamentally unfair or unreliable, and that the prisoner's assertions about the potential effects of the omitted proof do not establish a 'reasonable probability' that the result of the proceeding would have been different, nor any probability sufficient to undermine confidence in the outcome. Therefore, any ineffective assistance of counsel did not result in actual prejudice to the accused." *Williams* v. *Warden*, 254 Va. 16, 25, 487 S. E. 2d 194, 199 (1997).

While the first part of this statement refers to *Lockhart*, the rest of the statement is straight out of *Strickland*. Indeed, after the initial allusion to *Lockhart*, the Virginia Supreme Court's analysis explicitly proceeds under *Strickland* alone.*

---

*In analyzing the evidence that was presented to the sentencing jury, the Virginia Supreme Court stated: "Drawing on *Strickland*, we hold that, even assuming the challenged conduct of counsel was unreasonable, the prisoner 'suffered insufficient prejudice to warrant setting aside his death

See 254 Va., at 26–27, 487 S. E. 2d, at 200. Because the Virginia Supreme Court did not rely on *Lockhart* to make its decision, and, instead, appropriately relied on *Strickland,* that court's adjudication was not "contrary to" this Court's clearly established precedent.

The question then becomes whether the Virginia Supreme Court's adjudication resulted from an "unreasonable application of" *Strickland.* In my view, it did not.

I, like the Virginia Supreme Court and the Federal Court of Appeals below, will assume without deciding that counsel's performance fell below an objective standard of reasonableness. As to the prejudice inquiry, I agree with the Court of Appeals that evidence showing that petitioner presented a future danger to society was overwhelming. As that court stated:

> "The murder of Mr. Stone was just one act in a crime spree that lasted most of Williams's life. Indeed, the jury heard evidence that, in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw." 163 F. 3d 860, 868 (CA4 1998).

sentence,'" 254 Va., at 26, 487 S. E. 2d, at 200 (quoting *Strickland* v. *Washington,* 466 U. S. 668, 698–699 (1984)); "[w]hat the Supreme Court said in *Strickland* applies with full force here: 'Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed;'" 254 Va., at 26, 487 S. E. 2d, at 200 (quoting *Strickland, supra,* at 700); and "[i]n conclusion, employing the language of *Strickland,* the prisoner 'has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. [The prisoner's] sentencing proceeding was not fundamentally unfair,'" 254 Va., at 27, 487 S. E. 2d, at 200 (quoting *Strickland, supra,* at 700).

In *Strickland,* we said that both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. 466 U. S., at 698. It is with this kind of a question that the "unreasonable application of" clause takes on meaning. While the determination of "prejudice" in the legal sense may be a question of law, the subsidiary inquiries are heavily factbound.

Here, there was strong evidence that petitioner would continue to be a danger to society, both in and out of prison. It was not, therefore, unreasonable for the Virginia Supreme Court to decide that a jury would not have been swayed by evidence demonstrating that petitioner had a terrible childhood and a low IQ. See *ante,* at 395–396. The potential mitigating evidence that may have countered the finding that petitioner was a future danger was testimony that petitioner was not dangerous while in detention. See *ante,* at 396. But, again, it is not unreasonable to assume that the jury would have viewed this mitigation as unconvincing upon hearing that petitioner set fire to his cell while awaiting trial for the murder at hand and has repeated visions of harming other inmates.

Accordingly, I would hold that habeas relief is barred by 28 U. S. C. § 2254(d) (1994 ed., Supp. III).