In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3774

Michael Reeves,

Petitioner-Appellant,

v.

United States of America,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4537--James B. Zagel, Judge.

Argued May 14, 2001--Decided June 22, 2001


  Before Bauer, Rovner, and Diane P. Wood,
Circuit Judges.

  Bauer, Circuit Judge.  Michael Reeves
filed a petition under 28 U.S.C. sec.
2255 challenging his conviction as
obtained in violation of his Sixth
Amendment right to effective assistance
of counsel. The district court denied the
petition because Reeves failed to
demonstrate prejudice. Reeves appeals,
and we review the denial of relief under
sec. 2255 de novo. See Blacharski v.
United States, 215 F.3d 792, 794 (7th
Cir. 2000).

BACKGROUND

  Reeves, represented at trial by attorney
Christopher L. Bohlen (and L. Patrick
Power, whose nominal role will not be
discussed), was convicted by a jury in
June of 1998 of mail fraud under 18
U.S.C. sec. 1341 for using the mails in a
scheme to defraud his employer, Cherry
Communications, Inc. ("CCI"), of money
for work on two projects that he failed
to complete and for depriving CCI of
honest services by not disclosing his
self-dealing.
  At trial the following evidence was
adduced. CCI was a long-distance
telephone company headquartered in
Westchester, Illinois owned by James
Elliot. Elliot and CCI's President,
Michael Dyer, wanted to expand the

business by constructing switch sites to route calls on its long-distance network. Lacking the skill to do this themselves, they hired Reeves as Vice President of Engineering in January of 1995. Reeves' resume indicated that he had completed two years at MIT and two years at Florida State University, earning a B.S. in electrical engineering. Elliot and Dyer bragged to others that Reeves had a "double E from MIT." In reality, while Reeves had taken some classes, he never earned a degree.

To purchase equipment to construct the switch sites, Reeves was instructed to submit a check requisition form to Elliot for approval and then to CCI's comptroller, Cherrie Marks-Pozniak, who would issue a check. On July 6, 1995, Reeves submitted a check requisition form to Elliot for the purchase of $6,627 worth of equipment to be installed at the South Federal Street switch site in Chicago from a company named Electronic Products located at 6645 La Pas, Indianapolis, Indiana 60164. Elliot approved the request and Marks-Pozniak gave Reeves a check payable to Electronic Products, whereupon it was endorsed with a typewriter and deposited in a bank account Reeves had opened under the name Electronic Renaissance.

On July 14th, Reeves submitted another form to Elliot for more equipment for the South Federal Street site payable to Electronic Products for $15,172. The address listed for Electronic Products this time though was 6264 La Pas, Indianapolis, Indiana 60155. Furthermore, an invoice submitted with the check requisition form listed yet another address for Electronic Products--P.O. Box 307, Bradley, Illinois--which had been rented by Reeves under the name Electronic Renaissance. The invoice also stated that the equipment was to be billed and shipped to CCI at 6264 La Pas, Indianapolis, Indiana 60155. Despite these inconsistencies, Elliot approved the request, and again, a check was given to Reeves, endorsed with a typewriter, and deposited in the Electronic Renaissance bank account.

In August, Reeves recommended that CCI buy alarm systems to secure its unmanned switch sites. Elliot and Dyer approved the purchase of the systems for over

$88,000, to be paid in four monthly installments. Reeves submitted a form for the first installment, to be paid to a company named Digital Alarm Products at P.O. Box 172, Bradley, Illinois. Marks-Pozniak asked Reeves if she should contact the vendor to set up a payment schedule. Reeves insisted that he ask himself because the vendor was "touchy" and "didn't like to talk to just anybody." CCI issued the first installment check on September 7th for $22,173. Reeves was given the check, it was endorsed with a typewriter and deposited in the Electronic Renaissance bank account.

On September 8th, although CCI was unaware of Reeves' dealings, he was fired for poor job performance. Still ignorant, on October 18th, CCI issued a $22,173 check for the second installment. Since Reeves was gone, CCI mailed it to the P.O. Box listed on the invoice, which unbeknownst to CCI was rented by Reeves. As before, the check was endorsed with a typewriter and deposited in the Electronic Renaissance bank account.

Robert Carrabis, who became Vice President of Engineering after Reeves' termination, noticed that the alarm system had never been delivered, so he called Digital Alarm Products to inquire and heard Reeves' voice on the company's answering machine. Finally realizing that something was amiss, CCI hired a private investigator and informed the police. They discovered that neither the Illinois nor Indiana Secretary of State offices had records for companies named Electronic Products or Digital Alarm Products.

At trial, the government charged that Reeves' scheme was to submit false forms from phony equipment suppliers to obtain money from CCI to satisfy his personal debt. To prove its theory, the government offered the testimony of Elliot, Dyer, Carrabis, Marks-Pozniak, and a postal inspector who attested that the addresses given for Reeves' companies were fictitious. A bank employee also introduced the Electronic Renaissance account records and a summary chart of expenditures made from the account with money from CCI. It was also shown that Reeves' bank account had been overdrawn several times in the months before he

undertook this scheme, and in June of 1995 his balance was $8.17. The government also proved that checks written on the Electronic Renaissance account with CCI's money were issued to, among others, American Express, Kankakee Bell Credit Union for a loan payment, Ameritech, Dr. Martello, Reeves himself, and cash. Other documentary evidence included the check requisition forms and invoices submitted by Reeves and his 1995 federal income tax return showing that he did not report income realized by his companies from CCI.

Reeves' attorney cross-examined the government's witnesses. Reeves did not take the stand or present witnesses in his defense. Reeves' defense was that the government failed to meet its burden of proof because Elliot's testimony was incredible in light of his prior criminal convictions, and the government had failed to prove that any check had been mailed using the U.S. Postal Service.

After Reeves was convicted and sentenced, he filed a direct appeal, voluntarily dismissed it, and then filed a sec. 2255 petition. The district court permitted discovery, held an evidentiary hearing, and heard oral arguments on Reeves' sec. 2255 petition.

At the evidentiary hearing on April 14, 2000, Reeves testified that Bohlen met with him three times prior to trial-- in September of 1997, and in February and May of 1998-- and that the brief meetings were not substantive. Bohlen testified that he did not take notes of these meetings and could not recall what had been discussed. At the first meeting Reeves told Bohlen to visit the South Federal Street site because he had purchased and installed equipment there. Bohlen confirms that Reeves said this, but admits that he did not go see whether the equipment was indeed there. Reeves also told Bohlen that some of the alarm system equipment was at his home, but again, Bohlen did not investigate the claim. Reeves further said to Bohlen that he had partially performed on the alarm system project by diagraming a plan and gathering parts, which were still in his garage. He claimed that he would have finished if he had received the final two installment checks. Instead of investigating, Bohlen asked Reeves for

documentation of the purchases, but Reeves did not have any. Bohlen admitted that in preparing for trial he did not interview anyone except Reeves and told him not to testify.

In support of his contention that he had fully performed the South Federal Street job and partially performed the alarm system project, Reeves offered a report of a private investigator who visited the South Federal Street site and Reeves' garage, accompanied by Reeves. The report said that there was equipment at the South Federal Street site, which Reeves identified as the equipment he had purchased. It also stated that there was electrical equipment in Reeves' garage. Reeves also offered copies of a memorandum he had written to Dyer dated September 6th, two days before he was fired, detailing the work he had completed and of a letter he wrote to Elliot in November, offering to complete the alarm project despite his termination. Reeves had given Bohlen these documents, but they were not used at trial. Furthermore, Reeves testified that Elliot asked him to purchase equipment through his companies because CCI was having financial difficulties. Reeves claimed that his companies had been in business for many years and were not fictitious, and he was ignorant of the fact that he had to register with the Secretary of State.

Finally, Reeves testified about his personal background, specifically that he had served in the military for ten years where he enjoyed FBI and top-security clearance and had worked for several telecommunications companies before CCI. He explained that he took some classes at MIT over a two-year period, but denied that he told Elliot or Dyer that he was a "double E from MIT."

On cross-examination, Reeves said that he had no documentation, such as invoices or checks, to show that he bought equipment for CCI. He admitted that he used fictitious addresses on the check requisition forms. He could not explain why he was the only signatory on the Electronic Renaissance bank account since he claimed that the company was owned by someone else. Further, the government offered evidence admissible under Fed. R. Evid. 404(b), namely that Reeves had made

false statements in bank loan applications, in his resume to CCI, in his 1995 federal income tax return, and in the unemployment application he filed with the State after he was fired from CCI.

Reeves contends that the new evidence supports his defense that he did not intend to defraud CCI. The district court saw it otherwise and denied the sec. 2255 petition. The court noted that it found Bohlen's "performance in preparing for this trial to be dangerously and inexcusably close to the line of ineffective assistance, if not over it. While the law presumes an attorney's competence and reasonableness, I can find no reasonable trial strategy in failing to investigate a case at all." However, the district court declined to hold that Bohlen's performance, even if ineffective, prejudiced Reeves' case.

The district court summarized that all of the "new" evidence emanated from Reeves or the investigator, whose work was based on what Reeves told him. For example, the memorandum and letter were written by Reeves. No other witnesses, such as a vendor, testified that Reeves' businesses were legitimate or that he had purchased equipment for the projects. No invoices, receipts or checks were produced to verify that he had purchased equipment. No explanations were given as for why Reeves used fictional addresses on check requisition forms. The district court found that Reeves' self-serving evidence did not undermine confidence in the outcome. The court wrote: "Ultimately, all of the additional evidence comes from Reeves himself uncor roborated . . . and given his own credibility problems, its submission to the jury would not have produced a different result."

The district court also found that the additional impeachment evidence for Elliot, namely the fact that he owned CCI when it went bankrupt and had judgments entered against it for nonpayment of taxes, would not have damaged his credibility beyond that already done at trial. Elliot's prior convictions had already been testified to in order to im peach him at trial, so the jury weighed his two convictions for mail fraud and one conviction for providing false infor

mation to a federal law enforcement officer in assessing his credibility. Further, the jury heard and considered the parties' stipulation that CCI had filed a voluntary bankruptcy petition at the time of trial. The district court reasoned that since the defense offered no motive for Elliot to lie, there was no reasonable probability that a jury would assess Elliot's credibility differently.

The district court concluded that: "[h]aving personally heard Reeves testify at the evidentiary hearing, and remembering the evidence as it came in at trial, I do not agree that Reeves' testimony--had it been offered--alone would have changed the verdict." The court so held because Reeves had "too many empty explanations for the many oddities in his business practices," the "fictional nature of the addresses, their mix-and-match nature, and his failure to register any of them with the Secretary of State, all undermines his testimony about the businesses' legitimacy," and Reeves' explanations were "not persuasive evidence of his innocence." The court also added that the government had effectively cross-examined Reeves. Based on all of the foregoing, the district court denied Reeves' petition.

DISCUSSION

Under Strickland v. Washington, Reeves bears the burden of showing that his counsel's performance fell below an objective standard of reasonableness and outside the wide range of professionally competent assistance. See 466 U.S. 668, 687 (1984). He must also show prejudice, which means showing that but for his counsel's unprofessional errors, there is a reasonable probability that the result in his case would have been different. See id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome, although merely some conceivable effect of the errors on the outcome is not enough. See id.

Reeves' first argument is that the district court applied the wrong legal standard to his case. In the beginning, the district court articulated the proper standard; Reeves' contention is that after the district court mouthed the correct standard it turned around and

held him to a higher one. Reeves contends that the district court misapplied the prejudice prong of Strickland by (1) requiring him to prove that he was actually innocent, (2) requiring him to prove that the outcome would have more likely than not been different but for his attorney's errors rather than just a reasonable probability of a different outcome, and (3) resting its decision solely on Reeves' credibility instead of the totality of the circumstances. Reeves misreads the court's opinion.

While Reeves is correct that requiring a defendant to prove actual innocence or that the outcome would have more likely than not been different would be an incorrect articulation or application of the prejudice test, see generally Glover v. United States, 121 S. Ct. 696, 700-01 (2001), Williams v. Taylor, 120 S. Ct. 1495, 1513-14 (2000), we find that after giving the district court's opinion a thoughtful read that there is not a scintilla of support for Reeves' analysis of the district court's opinion. It is enough to say that Reeves' appellate argument quotes the words chosen by the district court out of context. The very heart of the opinion was an examination of the totality of the evidence to determine whether the court's confidence in the jury's verdict was undermined by the new evidence. The district court concluded that his confidence in the verdict remained intact.

Reeves' second argument is that if the district court had applied the correct standard it would have found that his case had been prejudiced. We disagree. Reeves paints the government's case as based on weak circumstantial evidence and Elliot's incredulous testimony. Given the weakness of the case against him, he asserts that if he had testified a different outcome may well have resulted because the jury would have been asked to resolve a credibility contest between him and Elliot. Not so. The case would not have become merely a "he said, he said" if Reeves had testified; not only did Dyer and Marks-Pozniak corroborate Elliot's testimony, but the thrust of the government's case was documentary evidence. In contrast, Reeves offered self-serving statements and documentary evidence of little relevance. The memorandum and letter offered by Reeves

shed little light on the matter; they were written by Reeves who had an overwhelming interest in covering up what he was or was not doing during his employ at CCI.

Reeves also complains that the district court improperly based its decision solely on his credibility. He asserts that the district court should not have decided whether it found Reeves credible, but rather should have decided whether confidence in the jury's verdict had been undermined. But, we read the opinion as saying exactly the latter--after hearing the evidence presented by the defendant, the court's confidence in the outcome had not been undermined. This is quite different from the court saying that it did not think that a jury would believe Reeves. Moreover, the district court lingered on Reeves' credibility as a witness because, not only was it the bulk of the new evidence, but one of Reeves' claims was that Bohlen was deficient for not allowing him to testify. In response the court evaluated whether the new evidence presented through Reeves' testimony had a reasonable probability of altering the result. The court's opinion carefully assessed all of the new evidence, including Reeves' testimony, and found that it offered little, as do we.

CONCLUSION

The district court's denial of Reeves' sec. 2255 petition is hereby Affirmed.