**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0602n.06
Filed: July 14, 2005

No. 04-3806

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **CAROL FINKES,** | ) | |
| | ) | |
| Petitioner-Appellant | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| **DEBORAH TIMMERMAN-COOPER,** | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Respondents-Appellee | ) | |
| | ) | |
| | ) | |

BEFORE:    MERRITT and ROGERS, Circuit Judges; and HOOD, District Judge[*]

**MERRITT, Circuit Judge.**    The habeas petitioner, Carol Finkes, was convicted of aggravated murder in Ohio in January 2001, and was sentenced to 20 years to life. She filed an appeal to the Ohio Court of Appeals, which affirmed the judgment of the trial court. New lawyers appeared for her in the Court of Appeals proceeding. The Ohio Supreme Court denied review. Without filing for post-conviction review in the state courts, petitioner filed her federal habeas corpus petition. It was denied in a magistrate's 40-page report and recommendation, a recommendation which District Judge Graham accepted. On appeal Finkes raises constitutional

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

issues of prosecutorial misconduct, trial error in the exclusion of evidence, and ineffective assistance of counsel. We affirm.

## I. Facts and Standard of Review

The basic theory of the prosecution's case, which the jury obviously accepted, was that Finkes shot and killed James Coyan, a 17-year-old boy whom she had employed at her local store in Dublin, Ohio. The proof is clear that she shot him intentionally in a room above the store and then put a pistol in his hand, called 911, and staged a scene to provide herself with a self-defense justification for the crime. The question of motive is not clear, but it is clear that the jury did not accept her plea of self-defense.

Finkes owned a retail shop known as "The Bait Store" in Dublin, Ohio. A two-bedroom apartment and an office were on the second floor of the store building. She rented the apartment to Glen Weingarner, for whom she had been the legal guardian since Weingarner suffered a stroke. Finkes often stayed in the apartment during the week, but she owned a home adjacent to the store where she lived on the weekends with her common-law husband, Hans Schlotterer. Finkes and Schlotterer were married in 1965 and divorced in 1980, but continued to live together after the divorce and hold themselves out as common-law husband and wife. Finkes kept money in several places in the store and apartment, including in a dresser in her upstairs bedroom. Her testimony was that at the beginning of April 2000, there was between $12,000 and $16,000 in the dresser.

Seventeen-year-old James Coyan was a troubled youth with a history of minor delinquency, including petty theft and truancy. In January 2000, he appeared in juvenile court on delinquency

charges, including "aggravated menacing" against his mother. He was ordered to find a full-time job, among other conditions. Coyan began working part-time for Finkes at the store in February or March 2000. He became a full-time employee in April 2000.

Finkes testified that the store was burglarized on April 10, 2000, and $4,000 in cash was taken from a cabinet in the store, along with cigarettes and lottery tickets. A week later, she noticed a large sum of cash missing from her bedroom dresser. On April 29, she counted the money in the dresser, and only $4,600 remained of the estimated $12,000 to $16,000. She suspected Coyan of taking the money, but she did not confront him or inform anyone else of her suspicions.

Finkes and Schlotterer arrived at the store on Monday, May 1, at about 6:50 A.M. At approximately 12:45 P.M., Finkes sent two of her employees on an errand, leaving only Coyan and herself in the store. Schlotterer was outside in the yard. She testified that she went upstairs to go to the bathroom and when she came out she saw Coyan walk into her bedroom. He sat on the edge of the bed, opened the bottom dresser drawer, took out several bundles of money, and then rifled through the top drawer. She decided to confront Coyan. She retrieved a .22 caliber pistol from the bathroom and hid it behind her back. She then asked Coyan what he was doing, and he replied he was not doing anything. She asked him if he was stealing money, which he denied, and said he was getting money for the register. She again accused Coyan of stealing. According to Finkes, Coyan stood up, started to pull a .9 mm pistol from a holster and took a couple of steps toward her. She testified that she was "terrified" because she believed Coyan was going to shoot her and there was no way for her to escape from the room except to get by Coyan. She took the gun from behind her back and shot Coyan.

Finkes testified that at first she thought she missed Coyan because he did not move and she kept her gun trained on him. At that point, Finkes noticed that her husband, Schlotterer, was standing to her left; but she does not know when he entered the room. She testified that Coyan then fell onto the bed with the gun near his left hand partially out of the holster. She walked over to the bed, took the gun the rest of the way from the holster and put it in Coyan's right hand because she wanted the "authorities . . . to know that he had it [in his hand] and he was going to use it on me."

She then called 911 from a phone in her bedroom and falsely reported a robbery in progress. She testified that she claimed the robbery was still ongoing because she was afraid the police would not believe she acted in self-defense. She said she was afraid the police would not believe her because she had had previous confrontations with the police. She went downstairs to see if anyone was in the store. She told her husband to remain in the bedroom with the gun pointed at Coyan.

Finkes told two customers to leave the store and went back upstairs to check on her husband. Coyan was still on the bed, and she did not know whether he was dead or alive. She ran downstairs and called 911 again. She told the dispatcher that someone had come into her apartment and she shot him. She then saw Officer Hall outside the store with his gun drawn. He motioned for her to come towards him; she motioned for the officer to come inside the store. When she realized that the officer was not going to come inside, she went upstairs to get her husband. She took the gun from her husband and hid it on a shelf under some paper bags. She went outside and told the officer she had shot Coyan.

The 911 dispatcher testified that Finkes told her there was a robbery in progress and she heard her say, "Jimmy, Jimmy stand still" and "Dammit, put the gun down." The dispatcher testified

that when Finkes called back approximately two and one-half minutes later, the dispatcher asked for more details and Finkes identified the man as an employee who had worked at the store a few weeks. He had gone upstairs, and "[h]e got the gun out and so I shot him with mine." When asked if she was injured, Finkes responded, "No, I'm not injured. I shot before he did injure me." The dispatcher testified that she overheard her say, "Make sure it's unlocked."

Hall testified that Finkes and Schlotterer walked out of the store, and she told Hall that she had shot Coyan upstairs because he had a gun and was trying to get her money. Hall was unfamiliar with the building, and he asked her for directions to the second floor. Both Schlotterer and Finkes started to go upstairs with Hall, but he ordered them to remain downstairs.

Hall found a man lying across the bed with a pistol in his right hand, which was positioned above his head. An empty holster was tucked under his left leg. After observation, Hall presumed the man was dead and rolled him over, exposing a gunshot wound to the chest. Hall discovered a spent .22 caliber shell on the rug and some loose bills on the dresser. Later investigation also revealed four packets of folded paper money on the dresser, $2,294 in the bottom drawer, and $452 in Coyan's pocket. The .22 pistol that Finkes had hidden was also discovered and was the pistol from which the casing found in the bedroom had been fired. The .9 mm pistol found in the bedroom had a round in the chamber and another five rounds in the magazine. The hammer was down, and the safety lock was on.

Finkes was interviewed by two Dublin police officers. She later testified that she lied by telling the officers that a robbery was in progress when she made the first 911 call, that Coyan had taken the gun completely out of the holster and pointed it at her before she shot him, and that she

had unsuccessfully tried to take the gun out of Coyan's hand after she shot him. She testified that, midway through the interview, she decided to tell the truth. At that point she admitted that she did not make the first 911 call until after she had shot Coyan, that Coyan had never taken the gun completely out of the holster and pointed it at her, and that after she shot Coyan, she took the gun the rest of the way out of the holster and placed it in his hand. She admitted that she shot Coyan intentionally but said it was out of fear for her life because he pulled a gun on her and she believed he was intent on killing her.

The prosecution had difficulty ascribing a motive for the crime. Its theory of the case at trial was that Finkes killed Coyan in order to keep him from exposing Finkes' illegal business practices, such as failure to pay taxes. She lured him upstairs, shot him and then placed the gun in his hand after he was dead to make the shooting look like self-defense.

We review *de novo* the decision of the District Court denying the habeas petition. Our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-32, 110 Stat. 1214 (1996). Under the Act, habeas relief may not be granted with respect to any claim adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). We must presume that all determinations of factual issues made by the state court are correct unless the petitioner can rebut that presumption by clear and convincing evidence.

*See* 28 U.S.C. § 2254(e)(1). In *Williams v. Taylor*, 529 US. 362 (2000), the Supreme Court determined that a state court's decision is contrary to clearly established federal law where that court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id*. at 413. The *Williams* Court further held that a state court unreasonably applies clearly established Supreme Court precedent when it correctly identifies the governing legal principle in the case, yet unreasonably applies that principle to the facts of the defendant's case. *See id.*

## II. Prosecutorial Misconduct

Finkes claims numerous instances of prosecutorial misconduct during the prosecution's cross-examination and during the closing argument. She argues that the misconduct deprived her of a fair trial and entitles her to habeas relief. Specifically, she objects to (1) references that she committed tax violations and other dishonest acts, (2) questions about her honesty in her business transactions, (3) misrepresentations of her testimony, and (4) questions concerning why she did not call her common-law husband to testify on her behalf. All of those claims fail because the state court decision is not "contrary to" a decision of the Supreme Court.

### 1. Procedural Default

The State argues that all Finkes' claims of prosecutorial misconduct are procedurally defaulted because defense counsel did not object to the challenged statements or questions at trial. Finkes did, however, raise the alleged prosecutorial misconduct on direct appeal. The opinion by the Ohio Court of Appeals addresses each alleged instance of misconduct on the merits. In

discussing the merits, the Court of Appeals noted in one place that "Defendant lodged no objection to this testimony [concerning alleged tax violations by Finkes]," *State v. Finkes*, No. 01AP-310, 2002 WL 464998, at *9 (Ohio Ct. App. Mar. 28, 2002), and the court specifically stated that its review of the prosecutor's comments about the failure of Finkes' husband to testify was for plain error due to defense counsel's failure to object at trial. *Id.* at *13. Then, in its summation of the entire prosecutorial misconduct issue, the court states "we conclude that defendant has failed to demonstrate plain error resulting from any question or argument to which she failed to object and has failed to demonstrate improper conduct from any question or argument to which she objected." *Id.*

On habeas review, the District Court concluded that, with the exception of the argument concerning the prosecution's comments on the failure of Finkes' husband to testify, the Ohio Court of Appeals did not adequately state whether its "decision rested on federal law, a state procedural default, or both." Report and Recommendations at 23, J.A. at 532. It, therefore, reviewed all of the prosecutorial misconduct claims on the merits except for Finkes' claim that the prosecutor improperly commented on Finkes' failure to call her husband as a witness, which claim it found procedurally defaulted. *Id.*

Like the District Court, we are not persuaded that the Ohio Court of Appeals clearly and expressly relied on state procedural default — the failure of defense counsel to contemporaneously object to the alleged errors at trial — to reject Finkes' claims of prosecutorial misconduct. *See Harris v. Reed*, 489 U.S. 255 (1989). We also doubt that the Ohio Court of Appeals adequately rested its judgment on a state rule requiring contemporaneous objection when it rejected Finkes'

arguments concerning the comments by the prosecutor about Finkes' husband's failure to testify.

After noting defense counsel's failure to object, the state court stated, "Notwithstanding defendant's

failure to preserve the issue for appeal, we conclude that the prosecution's comments did not

constitute prosecutorial misconduct" and then proceeded to examine the claim on the merits. *State*

*v. Finkes*, 2002 WL 464998, at *12. Therefore, we will review all of Finkes' prosecutorial

misconduct claims on the merits.

### 2. Merits of the Prosecutorial Misconduct Claim

**(a) Comments Regarding Finkes' Alleged Tax Violations, Dishonest Acts and**

**Questionable Business Dealings. —** Finkes first complains about the prosecution's questions on

cross-examination about her alleged tax law violations. As part of the prosecution's case-in-chief,

Bait Store employees testified that Finkes always paid them in cash. She lodged no objection to this

testimony. When cross-examining Finkes, the prosecution asked her whether she paid her

employees in cash, and, if so, whether she paid applicable employment taxes. She admitted that she

paid her employees in cash and did not pay applicable taxes on their wages. She explained her

actions by implying that she did not have to report her employees' wages because they did not earn

enough money to warrant doing so.

Finkes simply argues a general due process violation because the prosecution's line of

questioning was improper under two Ohio Rules of Evidence: (1) Rule 404(B), which allows the

admission of evidence of other crimes, wrongs, or acts when offered for a limited purpose, such as

to establish proof of motive to commit the charged crime; and (2) Rule 608(B), which allows

questioning regarding specific instances of misconduct. Specifically, defendant contends that the

prosecution's questions were an attempt to use "other acts" evidence, such as the alleged tax law violations, to supply a motive for defendant to murder Coyan. She contends that the prosecution could not use such "other acts" evidence to supply a motive for the crime because the prosecution did not provide substantial evidence, such as tax returns, financial records, accountant testimony or an independent audit, to establish that Finkes had actually violated tax laws. The Ohio Court of Appeals rejected this argument. *State v. Finkes*, 2002 WL 464998, at \*10.

Finkes fails to comply with 28 U.S.C. § 2254(d)(1) requiring that state court rulings on such issues must be "contrary to or an unreasonable application of," Supreme Court precedent. Finkes cites no applicable Supreme Court precedent and makes no argument that the state court's ruling violates this section of AEDPA. Finkes does not discuss or even mention AEDPA, nor recognize that she must meet this standard. Therefore, we must affirm the District Court on this issue. Our independent research discloses no Supreme Court authority that would forbid such cross-examination.

**(b) Comments about the Failure of Hans Schlotterer, Finkes' Common-law Husband, to Testify.** — During closing arguments and rebuttal, the prosecution questioned several times why Finkes' common-law husband, Hans Schlotterer, did not testify:

> Hans Schlotterer, kind of an enigma in this case . . . . They are on good terms. They still consider themselves husband and wife . . .

> Mr. Schlotterer, unlike all of these witnesses the defense did call was, according to Finkes, the only living person in The Bait Shop other than her at the time that Jimmy Coyan was killed.

> [Schlotterer] is now presumably in her corner. Why did the defense not call him to support her self-defense claim?

> So why is it there's one witness that can support Finkes in herself defense [sic] claim as been implied here by Carol Finkes in her testimony, why, why, why, did they not call him to give that support? You decide.

> We know she planted the gun. Why shouldn't she plant the money and plant the body? And why isn't Hans here to tell us about that . . . ?

> [Finkes] has the burden to prove self-defense . . . . And it is fair to ask where is Hans[?]

On this claim that due process prohibits the prosecutorial statements concerning the failure to call Finkes' former husband, she cites only the old Supreme Court case of *Graves v. United States*, 150 U.S. 118 (1893). In that case, the Court held as a matter of federal evidence law, not as a matter of due process, that the prosecutor's closing argument commenting on the absence of the wife from the courtroom (the prosecutor said that the defendant's wife "ought to have been sitting by the side of her husband during the trial") was improper because the wife was not a "competent witness." The *Graves* court acknowledged the presumption that when the accused has it "within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Id.* at 121. The Court merely held that the presumption does not apply if the witness is incompetent to testify. In *Graves*, the Court simply ruled as an evidentiary matter. It did not elevate its ruling to a constitutional level or in any way suggest that due process requires such a result. In the instant case, there is certainly no showing that this question rises to the level of a federal due process violation. Both the Ohio courts and the District Court held that the prosecutor's comments were proper under both the Ohio and the federal law of evidence. Furthermore, Finkes cites no Supreme Court precedent holding that due process forbids such prosecutorial statements about a missing witness.

### III. Evidentiary Rulings

At trial, Finkes sought to introduce evidence of Coyan's prior acts of violent behavior to support her claim of self-defense. Finkes contends that the trial court denied defendant her right to due process and a fair trial by granting the prosecution's motion *in limine* prohibiting her from eliciting testimony regarding past specific instances of Coyan's threatening and violent conduct.

The first prior act of violence that Finkes sought to introduce was from a defense witness. The witness would have testified that Coyan opened his jacket and revealed a gun after the two began to argue. The prosecution moved the trial court *in limine* to exclude further testimony regarding an alleged oral threat made by Coyan to the witness on the ground that Finkes did not have prior knowledge of the incident. Defense counsel argued that the statement should be included because it demonstrated the reason Coyan showed the witness the gun. The trial court excluded the alleged oral threat. Finkes also complains that the trial court improperly prohibited defense counsel from discussing in closing argument the "aggravated menacing" charge filed against Coyan by his mother.

The Ohio Court of Appeals affirmed the exclusion based on the Ohio Supreme Court's ruling in *State v. Barnes*, 759 N.E.2d 1240 (Ohio 2002). *Barnes* holds that: "[A] defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor." *Id.* at 1245. Barnes cited authority from the federal courts interpreting the analogous Federal Rules of Evidence 404 and 405. *See*, *e.g.*, *United States v. Keiser*, 57 F.3d 847, 857 (9th Cir. 1985). Based on the *Barnes* opinion, Finkes decided not to raise the issue with

the Ohio Supreme Court because she believed it would be futile. The State now claims that the issue is waived because Finkes failed to exhaust the claim in the state courts. *See, e.g.*, *United States v. Keiser*, 57 F.3d 847, 857 (9th Cir. 1995).

Even if we agreed that the *Barnes* case would have rendered futile an attempt to assert Finkes' claim in the Ohio Supreme Court, we would reject her claim on the merits. Finkes does not cite any Supreme Court authority contrary to the ruling of the Ohio trial court or the Ohio Court of Appeals. She does not argue the merits of this issue at all in her brief submitted to this Court. Therefore, again we conclude that Finkes makes no showing that the Ohio court's ruling was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, as required by 28 U.S.C. § 2254(d)(1).

## IV. Ineffective Assistance of Counsel

Finkes contends that her trial counsel failed on multiple occasions to enter objections to improper questions and comments by the prosecutor during closing argument and that she was denied effective assistance of counsel in contravention of her rights under the Sixth and Fourteenth Amendments to the United States Constitution. To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant must first demonstrate that counsel's performance was deficient. The defendant may prove deficient conduct by identifying acts or omissions that violate reasonable professional judgment. We must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 690.

We conclude that Finkes has failed to demonstrate any deficiency in trial counsel's conduct.

Because the Ohio courts have held that the prosecution did not engage in improper questioning, argument or conduct under state law, and we find no such deficiency under the Sixth Amendment, defense counsel's failure to object to the prosecutor's actions does not constitute unprofessional conduct under the *Strickland* test.

For the foregoing reasons, we affirm the judgment of the District Court.