CRICHTON, J.,
additionally concurs and assigns reasons:
I agree in all respects with denial of this capital defendant’s writ application and write separately to emphasize the brutality of Bell’s murders of five church-goers and what strikes me as an inordinate delay in the State post-conviction process.
Anthony Bell publically asked his recently estranged wife, Erica, to reunite with him before the congregation of the small family church led by Erica’s mother, Pastor Claudia Brown. She rebuffed him. Bell, who had a history of responding violently to rejection, became agitated, walked outside, and came back into the church shooting. He then abducted his wife, killed her, and called 911 to claim she shot the members of the congregation before committing suicide by somehow shooting herself in the back of her head. However, Erica’s mother Claudia survived to identify Bell, despite having been shot in the head. In total, Bell killed five persons.
Bell insisted on representing himself, even in light of his counsel’s vigorous efforts to prevent him from doing so. Bell, however, prevailed in his desire to represent himself and presented a bizarre and inflammatory defense that Pastor Claudia Brown—whose daughter Bell killed and who was herself shot by Bell—was a compulsive liar who had been paying him for sex. Bell claimed the discovery of this relationship with his mother-in-law was the motive for Erica to shoot several members of her family, including her mother, before abducting him and ultimately killing herself. During the culpability phase of trial, the jury witnessed Bell asking his mother-in-law such questions as whether they ever watched pornography together, whether they ever engaged in oral sex, whether Bell ever ejaculated on Pastor Brown, whether Pastor Brown ever seduced Bell, and whether Pastor Brown’s husband was able to perform sexually.
Not surprisingly, Bell was found guilty as charged of five counts of first degree murder and one count of attempted first degree murder. In addition to the statutory aggravating circumstances that were proven beyond a reasonable doubt, the jury had endured the spectacle of Bell’s abusive cross-examination of a woman he not only shot but whose daughter he had killed. Finding no mitigating circumstances, the jury recommended the death penalty. To say that counsel, reappointed to represent Bell during the penalty phase at his request, faced an uphill battle is an understatement. However, despite the extremely negative impression Bell must have made on jurors during the culpability phase, counsel valiantly presented a mitigation case that included defendant’s lower than average IQ, his poor functioning, and a depiction of the defendant as a loving and caring father. “Even if a Petitioner shows that counsel’s performance was deficient, [] he must also show prejudice”; that is, he must show “a reasonable probability that but for counsel’s unprofessional errors, the result ... would have been different.” Williams v. Taylor, 529 U.S. 362, 394, 120 S.Ct. 1495, 1513-14, 146 L.Ed.2d 389 (2000) (citing Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)). Bell’s belated claims, of brain abnormalities not *340 withstanding (which by all indication are minor and within normal limits), he shows neither that counsel erred during the penalty phase nor, for the reasons above, any reasonable probability that the result would have been different.
As I have emphasized before, “the purpose of collateral review is not to second-guess trial counsel’s strategy with benefit of hindsight or provide a second penalty phase many years after the first.” See State v. Cosey, 15-1456, p. 1 (La. 6/17/16), 194 So.3d 602, 603. (Crichton, J., additionally concurring). In my view, collateral review in this case has taken an inordinate amount of time and wasted considerable resources that could have been better spent elsewhere in the important work of indigent defense. Bell committed his horrific crimes in 2006, the trial took place in 2008, the Louisiana Supreme Court affirmed the conviction and sentence in 2010, and the U.S. Supreme Court denied certio-rari in 2011. Six years later, after extensive and protracted post-conviction litigation, it is time that family members of the victims achieve closure and justice.